Samantha Drum (AZ 041439)
Kristina Aiad-Toss (OH 0101336) *Pro Hac Vice Forthcoming*
Brian Colón (NM 14624) *Pro Hac Vice Forthcoming*
Pilar Borneo (NM 153971) *Pro Hac Vice Forthcoming*
Meagan Dove (CA 313117) *Pro Hac Vice Forthcoming*
Katie Llamas (CA 303983) *Pro Hac Vice Forthcoming*
**SINGLETON SCHREIBER**
6501 Americas Pkwy #670
Albuquerque, NM 87110
Tel. (505)515-4745
sdrum@singletonschreiber.com
ktoss@singletonschreiber.com
bcolon@singletonschreiber.com
pborneo@singletonschreiber.com
mdove@singletonschreiber.com
kllamas@singletonschreiber.com

Carol Merchasin (MA 55672) *Pro Hac Vice Forthcoming*
**MERCHASIN LAW**
2300 Walnut Street #702
Philadelphia, PA 19103
Tel. (609) 666-8553
Carol@MerchasinLaw.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| NIKAI KHRIAD JOSEPH,<br><br>Plaintiff,<br><br>vs.<br><br>GLOBAL COMMUNITY COMMUNICATIONS ALLIANCE; ESTATE OF VAN OF URANTIA aka GABRIEL OF URANTIA aka GABRIEL OF SEDONA aka PRINCE MELFAX aka TALIASVAN aka ANTHONY JOSEPH DELEVIN; NANCY “NIÁNN” EMERSON CHASE; TIYIENDEA DELLERBA aka STACY LEE MYSZKA; CATHERINE “CENTRIA” LILLY; AMADON DELLERBA; SOULISTIC MEDICAL | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>Related Case:<br><br>4:26-CV-00369-JGZ |

INSTITUTE; AVALON UNIVERSAL ENTERPRISES, INC. d/b/a ARC ROOFING d/b/a EARTH HARMONY BUILDERS; CAMP AVALON; GLOBAL CHANGE MEDIA; AVALON SLOW FOOD(S) ENTERPRISES, LLC; GCCA ELDERS 1-X and DOES 1-X,

Defendants.

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Nikai Khriad Joseph by and through his attorneys, Singleton Schreiber and Merchasin Law, for his Complaint against Defendants, states as follows:

## I. INTRODUCTION

1. This civil action arises from a long-running scheme by Defendants Global Community Communications Alliance ("GCCA") and its leaders to extract unpaid labor and maintain total control over community members through systems of coercion, including physical and social isolation, abuse of authority, and the systematic use of fear. GCCA is a secretive, insular community in Santa Cruz County, Arizona, controlled, until his death in August 2025, by a self-proclaimed prophet, his wives, and a circle of hand-selected elders. The leader called himself Van of Urantia, also known as Gabriel of Urantia, Gabriel of Sedona, Prince Melfax, and Taliasvan, but his birth name was Anthony "Tony" Delevin ("Delevin"), who was born in Pittsburgh, Pennsylvania in 1948 and who also held himself out as the reincarnation of historical figures including George Washington and Alexander the Great.

2. Beginning at the age of seven or eight, Nikai Joseph was performing commercial agricultural labor on GCCA's farm called the Garden, which spanned roughly half of the community's approximately 227-acre compound. At eleven, he was working on roofing and

construction crews and by fourteen, he was using heavy equipment and working at heights. At fifteen, he was taken out of whatever limited schooling he had to work on a hemp production that included hand-pollinating acres of flowering hemp with a small paintbrush, wearing a mask that was not safety-rated for the dust, during shifts that routinely ran twelve hours and, on some days, as long as fourteen hours. The hemp harvested through that labor is processed today into a product line GCCA still sells under the name Mystic Farms, through Avalon Slow Food(s) Enterprises, LLC, in partnership with United Global Partners, LLC.

3. From early childhood to age eighteen — years when he should have had a childhood — Nikai was coerced into laboring in GCCA's commercial and non-profit ventures, and he was paid nothing. Not a single dollar.

4. Within their closed world, the Defendants engineered not only physical isolation, in which access to the outside world was severely limited, but also a system of coercion designed to break members down, isolate them psychologically, and make them dependent on the same people who were exploiting them for their labor. Surveillance was constant, punishments were severe, and obedience to GCCA leadership was mandatory. All of this was in the service of extracting labor. Members, including Nikai, were separated from their families, deprived of all autonomy, forced into uncompensated labor, denied independent access to money and communication with the outside world and threatened with catastrophic consequences for resistance or leaving.

5. Plaintiff's introduction to GCCA came approximately between his fourth and fifth birthdays at the end of a cross-country drive to Oregon that instead stopped, on a whim, in southern Arizona. His mother brought him from Pennsylvania, to start a new life in a new place. Instead, GCCA robbed him not only of the value of his labor among other things, but also of his

childhood as well.

6. Within months of arriving, Nikai was separated from his mother and placed in the basement of a communal house the group called “the Ark,” a structure with no true interior walls, only doors nailed together to form partitions. He lived there among strangers for years.

7. Nikai was permitted very limited access to his biological father. He spoke with him infrequently on speaker phone so that anyone in the room could monitor what was said. On the few occasions that his father was permitted to visit, Nikai was never allowed to be alone with him. He would always be accompanied by other members of the community who would be monitoring Nikai’s conversation. Eventually, his mother and another member of the community were married in a GCCA ceremony and Nikai had a stepfather who was in the community until 2019 when the stepfather himself escaped.

8. Nikai was not placed with a relative, or even with the same adult for any length of time. Instead, his caregivers rotated, unpredictably, at Delevin’s direction. Nikai’s mother remained inside GCCA, living in a separate house from Nikai until he was approximately 10 when she and his stepfather moved into a house with approximately 35 other people. She remains a member today.

9. During almost his entire childhood until he escaped at age eighteen, Nikai had little access to life outside of GCCA’s fenced compound except for an occasional chaperoned field trip and work on other properties owned by the Defendants.

10. His engineered financial dependency and lack of knowledge of the world were not an accident. Defendants worked to ensure that departure from the community would carry consequences so severe that failing to work and leaving would not be a realistic option.

11. Nikai did not work because he chose to. He worked because the alternatives that

GCCA engineered were worse. Inside the community, a child who did not comply with all instructions could be sent to the fields for a full day of work, stripped of his bed and belongings for as long as three months, or made to spend his few free hours writing out reflections on his supposed failings. Outside the community lay a world for which he had no money, no identification, no bank account, no credentials, and no one to turn to. GCCA built those realities, and it relied on them to keep him and other members working.

12. Nikai had personally and repeatedly witnessed what happened to members who tried to leave: confiscation of belongings, constant surveillance, monitoring, and public confrontations in which elders converged on the person until they had no choice but to relent. He understood exactly what awaited him if he tried to leave.

13. For years, Defendants concealed the true nature of GCCA's labor practices, misrepresented the voluntariness of members' participation, and enforced silence through fear of retaliation, shunning, and permanent separation from family and community. It is for these actions, and others set forth below, that Plaintiff seeks damages for the harm that was done to him.

## II. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, specifically the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581, 1584, 1589, and 1590, and 18 U.S.C. § 1595 confers a private right of action on victims of forced labor and trafficking.

15. This Court has personal jurisdiction over Defendants because the corporate Defendants operate in and transact business in the State of Arizona; the living individual Defendants reside in Arizona; the Estate of Delevin is subject to jurisdiction in Arizona, where

the decedent was domiciled and his estate is administered; and the acts and omissions giving rise to Plaintiff's claims occurred in Arizona.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and because one or more Defendants reside in this District. The GCCA compound and the conduct alleged herein are located in Santa Cruz County, Arizona, which lies within the Tucson Division of the District of Arizona.

## III. IDENTITY OF THE PARTIES

17. Nikai Khriad Joseph ("Plaintiff" or "Nikai"), currently a resident of Ypsilanti, Michigan, was born on May 11, 2005. He was brought into the GCCA community in 2010 at approximately age five. He remained continuously within GCCA until his departure at approximately age eighteen, in October 2023. Throughout his childhood and into early adulthood, Nikai performed extensive uncompensated labor for GCCA and its affiliated ventures, including agricultural, construction, landscaping, hemp-cultivation, and commercial media and music labor. As a direct and proximate result of Defendants' wrongful conduct, Nikai has suffered and will continue to suffer economic injury, emotional distress, pain and suffering, and other actual and consequential damages.

18. Defendant Global Community Communications Alliance ("GCCA") is an Arizona non-profit corporation operating a closed, communal compound in Santa Cruz County. GCCA was the primary beneficiary of the forced labor alleged herein. GCCA knowingly benefited, financially and otherwise, from the uncompensated value of members' labor, including Nikai's labor, and obtained and retained this labor through the coercive mechanisms described throughout this Complaint.

19. The Estate of Van of Urantia aka Gabriel of Urantia aka Gabriel of Sedona aka Prince Melfax aka Taliasvan aka Anthony Joseph Delevin ("Delevin") is named because Delevin directed the deployment of all members, including Nikai, across GCCA's commercial and nonprofit operations, established and maintained the system through which members' labor was obtained and controlled, and enforced compliance through the coercive mechanisms alleged herein. A notice to creditors has not been published, and the Estate can be served via its personal representative Defendant TiyiEndea Delevin DellErba a/k/a Stacy Myszka.

a. Delevin exercised ultimate authority over GCCA's structure, doctrine, finances, labor systems, family arrangements, discipline, and affiliated entities. Under his direction, members were denied meaningful autonomy and were compelled to perform labor for GCCA and its affiliated ventures.

b. Delevin directed the deployment of members across GCCA's commercial and nonprofit operations and enforced compliance through coercive mechanisms including economic dependency, surveillance, mandatory counseling, family separation, disciplinary programs, and threats of serious harm for resistance or exit.

c. Through these acts, Delevin directed and managed the affairs of GCCA and established and maintained the system through which members' labor was obtained and controlled.

20. Delevin and each individual Defendant described below exercised authority within GCCA's leadership structure ("GCCA Leadership") and participated in the operation or management of GCCA by directing, supervising, or implementing the policies and practices through which GCCA maintained control over members and obtained their labor. Each

individual Defendant obtained Nikai's labor through the coercive means described herein, and/or knowingly benefited, financially and otherwise, from participation in the venture that did so.

21. Defendant Nancy Emerson Chase ("Chase"), also known within GCCA as Niánn, is a co-founder and senior member of GCCA Leadership. Chase exercised authority over major areas of GCCA operations, including family structure, discipline, and labor practices affecting GCCA members. Chase participated in the leadership meetings where operational decisions affecting the community were made and possessed direct, organization-wide knowledge of GCCA's labor practices, its disciplinary and control mechanisms, and its internal handling of misconduct. Chase knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform uncompensated labor through coercion, and she knowingly benefited from that labor. Through her authority within GCCA Leadership, Chase directed and participated in the management of GCCA operations and affiliated businesses and in maintaining the institutional systems through which GCCA exercised control over members and obtained their labor.

22. Defendant Tiyiendea DellErba ("Tiyiendea DellErba"), also known as Stacy Lee Myszka, is an elder and a member of GCCA Leadership and one of Delevin's wives and principal lieutenants.[1] Tiyiendea DellErba exercised authority over members' family relationships, labor assignments, discipline, and compliance with leadership directives. She occupied a senior leadership position immediately beneath Delevin and the top tier of GCCA authority and issued or relayed directives through subordinate elders and supervisors. Through her leadership authority and enforcement role, Tiyiendea DellErba directed and implemented

[1] We use the word "wives" because Delevin held out both DellErba and Chase as his wives. The legal status of their relationships are unknown.

policies designed to maintain control over members and to ensure the continued extraction of their labor. She had direct responsibility for Nikai's labor in the landscaping and construction work.

23. Defendant Catherine J. Lilly ("Lilly"), also known as Centria, is an elder within GCCA Leadership and served as a principal manager of GCCA's financial and operational systems. Lilly controlled financial matters including lines of credit, property acquisitions, tax matters, and financial administration across multiple GCCA-affiliated ventures. Through her authority within GCCA Leadership, Lilly directed and participated in the management of GCCA operations, and knowingly benefited from the uncompensated labor of members, including Nikai.

24. Defendant Amadon DellErba is Delevin's son and a member of GCCA Leadership. Amadon DellErba oversees Camp Avalon and GCCA's Sedona-area rental properties, which he manages together with Catherine "Centria" Lilly. He is also the head of Global Change Media, in which capacity he directly oversaw Nikai's media and music labor. Nikai also performed weekly landscaping and painting at Amadon DellErba's personal residence (roughly five hours per week). Within GCCA's family-control system, Amadon DellErba was designated Nikai's "cosmic father" when Nikai was about fourteen.

25. GCCA Elders 1-X are individuals whose identities are presently unknown or whose full legal names are not yet confirmed, who participated in, supervised, or enforced GCCA's systems of coercion, labor extraction, discipline, and control.

26. Defendant Soulistic Medical Institute ("Soulistic") is an Arizona nonprofit corporation, EIN 16-1748771, operating a Medicare-certified hospice and healing center under the trade names Soulistic Hospice and Soulistic Healing Center, which are registered to and

owned by Defendant GCCA. Soulistic operates in Santa Cruz and Pima Counties, Arizona. Soulistic does not operate as an independent entity. It functions as an instrumentality of GCCA. Soulistic's sole director is Defendant Chase, a co-founder and leader of GCCA, and its officers include Defendant Chase (director and president/secretary) and Defendant Lilly (chief financial officer), both members of GCCA Leadership. Upon information and belief, Delevin was also involved in the leadership and operations of Soulistic until his death.

a. Soulistic knowingly benefited, financially and otherwise, from Nikai's labor, including years of landscaping and construction services.

b. Soulistic knew that this labor was compelled through the coercive mechanisms described throughout this Complaint.

c. Soulistic, through its officers, Defendants Delevin, Chase, and Lilly, who were simultaneously members of GCCA Leadership, obtained and retained the benefit of that labor through those same mechanisms. Soulistic continues to occupy and create revenue from Nikai's uncompensated work.

27. Defendant Avalon Universal Enterprises, Inc. ("Avalon") is an Arizona domestic for-profit corporation, operating under the trade names DBA Earth Harmony Builders (ROC #230898) and DBA ARC Roofing (ROC #232335). Avalon operates in Santa Cruz and Pima Counties, Arizona. Upon information and belief, Avalon does not operate as an independent entity. It functions as an instrumentality of GCCA. Avalon's sole director is Defendant Lilly, a leader of GCCA, and its officers include Defendant Chase (president) and Defendant Tiyiendea DellErba (vice president), both members of GCCA Leadership. Upon information and belief, Defendant Delevin was involved in the leadership and operations of Avalon.

a. Avalon knowingly benefited, financially and otherwise, from Nikai's labor.

b. Earth Harmony Builders, a construction entity wholly owned and operated through Avalon and GCCA, benefited from years of unpaid construction labor Nikai performed beginning at approximately age eleven, in the summer of 2016.

c. Avalon knew that this labor was compelled through the coercive mechanisms described throughout this Complaint.

d. Avalon, through its officers, Defendants Delevin, Lilly, and Tiyiendea DellErba, who were simultaneously members of GCCA Leadership, obtained and retained the benefit of that labor through those same mechanisms. Avalon continues to occupy and create revenue from Nikai's uncompensated work.

28. Defendant Camp Avalon, a campground and spiritual retreat in Sedona, Arizona, is operated and controlled by GCCA and managed by Amadon DellErba. Nikai performed landscaping work at Camp Avalon from the age of eleven onward, which included typical landscaping functions, as well as construction of campsites, tree trimming, and building of rock barrier walls.

29. Defendant Global Change Media is a commercial media and music enterprise that is operated, controlled, and financially supported by GCCA. On its website, Amadon DellErba is identified as the CEO and its workers are described as "full-time volunteers."

a. Beginning when he was approximately eight, GCCA began training Nikai in piano and music — not to develop his talent or expand his horizons, but to build a commercial music operation using labor compelled from a child. GCCA placed Nikai in three bands in 2021 and 2022, recorded him, produced albums, and put him on stage for paid, ticketed live performances held on

GCCA's property, all as part of Global Change Media's commercial output. These were full public shows on the GCCA property. They were filmed, and Nikai then edited and posted the video as part of his labor for Global Change Media. The recorded repertoire consisted of Delevin's songs, re-recorded commercially.

b. Nikai received no wages, royalties, or other compensation for this labor at any point, despite the ongoing commercial production and public performance of his work.

c. Nikai labored for Global Change Media, where he was under the ultimate supervision of Amadon DellErba, the head of Global Change Media. At Global Change Media, Nikai also filmed and edited video of his own and others' live performances, produced commercial drone and video packages for outside clients through Magic Land Realty (for example, charging roughly $1,200 for two property videos for an outside realtor with properties in Arizona and New Mexico), and set up, cleaned, and ran lighting and cameras for ticketed shows at the Sea of Glass venue.

d. Global Change Media knew that this labor was compelled through the coercive mechanisms described throughout this Complaint, and continues to benefit from and, upon information and belief, continues to exploit and profit from recordings and performances produced through Nikai's uncompensated labor.

30. Defendant Avalon Slow Food(s) Enterprises, LLC is an Arizona limited liability company operating the commercial hemp farming and wholesale business known as "Mystic

Farms," located on GCCA-affiliated property in Tumacácori/Santa Cruz County, Arizona. Its website describes it as a "fully licensed & certified hemp farming and wholesale company…. Mystic Farms has been developing High-CBD Type II hemp genetics since early 2017…. Through our strategic alliance with United Global Partners, we provide the highest quality genetics with a focus on feminized seed production." On information and belief, GCCA operates, controls, and supplies labor to Avalon Slow Food(s) Enterprises, LLC. Avalon Slow Food(s) Enterprises knew about and benefited from Nikai's uncompensated hand-pollination labor beginning at approximately age fifteen, in or about 2020.Defendants Does 1-X are persons or entities whose identities are unknown, but who participated in, facilitated, benefited from, or aided and abetted the unlawful conduct alleged herein.

## IV. GCCA BACKGROUND AND BENEFICIARY STRUCTURE

### A. The Organization

31. GCCA is a closed, hierarchical organization operating on a fenced compound of approximately 227 acres outside Tumacácori, in Santa Cruz County, Arizona, having formerly been located in the Sedona, Arizona area, together with affiliated properties and operations in other locations. GCCA presents itself publicly as a spiritual community and nonprofit organization, but in reality, it functions as a coercive, high-demand, high-control organization in which members are required to perform extensive uncompensated labor for the benefit of GCCA and its leadership and are kept there by numerous institutionalized systems of coercion.

32. GCCA was founded in 1989 (at that time it was called Aquarian Concepts Community) by Delevin, who portrayed himself as a prophet, a reincarnated historical figure, an extraterrestrial being, and a holder of divine authority. Members were required to bow as if to royalty when he entered a room. Delevin exercised complete control over members' daily lives,

finances, relationships, family structures, labor assignments, and access to basic necessities until his death in August 2025.

33. Delevin led GCCA with co-founder Defendant Chase, whom he referred to as his wife, and his additional wife, Defendant Tiyiendea DellErba, who served as his seconds-in-command. A hand-selected group of approximately ten "elders" formed the third tier of the hierarchy. Through this structure, GCCA Leadership exercised ultimate supervisory authority over all members and over every significant aspect of their daily lives, including their labor, their finances, their families, their medical care, and their freedom of movement.

34. Following Delevin's death in August 2025, GCCA Leadership's control structure remained unchanged. On information and belief, Defendants Chase, Amadon DellErba, and the Elders, including Defendants Lilly and Amadon DellErba, continue to exercise the same authority previously held jointly with Delevin, and the same coercive mechanisms, labor systems, and enforcement practices remain in effect.

35. The coercive labor practices described in this Complaint are not recent developments or the conduct of individuals acting outside this community's norms. They are long-standing, institutional features of GCCA and its predecessor organization, Aquarian Concepts Community.

36. The same mechanisms of control and labor extraction have operated for decades, spanning the period of Nikai's childhood entry in 2010, his adolescence and early adulthood inside GCCA, and his final departure in the fall of 2023, and they continued in effect through the time of filing.

**B. GCCA's Enterprise Structure**

37. GCCA operates a constellation of affiliated entities and commercial enterprises

that generate revenue, content, and other benefits for GCCA and its leadership. These affiliated operations include, without limitation:

a. Soulistic Medical Institute and Soulistic Healing Center

b. Global Alliance Properties

c. Avalon Universal Enterprises

d. Camp Avalon

e. Sea of Glass Center for the Arts

f. Global Change Media

g. Magic Land Realty

h. Food for Ascension

i. Commercial agricultural operations

j. Hemp cultivation and related operations

k. Media production and publishing operations

l. Performance and music-related activities including a recording studio called Future Studios

m. Clothing and resale boutiques including Sacred Treasures and Planetary Family Exchange

n. ARC Roofing

o. Earth Harmony Builders

38. On information and belief, these affiliated entities share management, ownership, or financial control with GCCA Leadership and funnel revenue back to GCCA. They do not operate as genuinely independent entities. They operate as instrumentalities of the GCCA ventures, staffed by members' uncompensated labor and controlled by the same leadership that

governs GCCA itself.

39. On information and belief, many of these businesses are registered under the name Avalon Universal Enterprises, and the profits funnel back to GCCA.

40. Separately, GCCA's hemp operation, conducted through Mystic Farms, maintains a commercial relationship with an outside entity, Defendant United Global Partners LLC, described publicly as a "strategic alliance" for hemp genetics and feminized seed production, ongoing since approximately 2018–2019.

41. Members, including Nikai, formed the core labor force of GCCA's operations and were assigned to work for for-profit and nonprofit operations without wages, benefits, or lawful employment protections. Nikai performed unpaid, coerced labor for Earth Harmony Builders, Soulistic Medical Institute, Soulistic Hospice, Magic Land Realty and other GCCA-owned property through his landscaping labor, Global Change Media, including his years of music training, band placements, recordings, and performances, as well as commercial video work for Magic Land Realty and venue production at Sea of Glass.

42. Labor assignments were mandatory, directed centrally by GCCA Leadership, and enforced through coercive mechanisms that governed all aspects of members' lives. GCCA and its leadership knowingly benefited, financially and otherwise, from this uncompensated labor.

43. Nikai's construction and landscaping labor, performed as a child and continuing into early adulthood, contributed directly to the maintenance and value of the physical properties GCCA and its affiliated ventures own and operate today, including Soulistic's hospice facilities and the broader GCCA compound.

## V. INSTITUTIONAL SYSTEMS OF COERCION AND THEIR OPERATION ON NIKAI

***Nikai's Entry into GCCA***

44. Nikai was brought into GCCA in or around 2010, at approximately four to five years old, by his mother, Kirsten Schwartz (known within GCCA by the community name "Genavein"). He was brought into a closed, coercive community by the person legally responsible for his care, who remains a member of GCCA today and who has worked chiefly in the community kitchen (as a lead, cooking daily meals for the community) and previously as a teacher of young children in GCCA's school.

45. Throughout his childhood and early adulthood inside GCCA, Nikai was subjected to a coordinated, interlocking set of coercive systems, designed to eliminate members' ability to refuse labor, assert autonomy, or leave ("Systems of Coercion" or "Systems"). These Systems of Coercion were not incidental. They were engineered and enforced by GCCA Leadership as a unified method of control.

46. The Systems of Coercion operated on children, like Nikai, in a different way than they operated on members who joined GCCA as adults. Nikai was brought into GCCA at a very young age and until his escape at age eighteen, he had never developed an independent existence outside it. He had no prior autonomy for GCCA to strip, no outside relationships for GCCA to sever, no financial independence for GCCA to take, and no memory of a life in which any of these things existed. Where adult members had to be isolated, indebted, and cut off from an existing life, GCCA never had to take these things from Nikai — it ensured he never had them to begin with. The Systems of Coercion described below required a fraction of the force against Nikai that they required against adult members, precisely because of his particular circumstances as a child raised entirely within the organization.

47. Each part of the Systems of Coercion reinforced the others: isolation, both

physical and informational, created conditions for coercion to flourish; constant work and mandatory meetings left no time to think about or consider escape; and exhaustion from forced labor made psychological resistance harder. Nikai, as a child and then a teenager, had never known anything else, and was not in a position to resist.

48. It was by these Systems that GCCA compelled its members, including Nikai, to perform extensive, uncompensated labor as the central purpose of the community's operations. Labor assignments were dictated by GCCA Leadership. Nikai did not control whether or not he worked, what work he performed, the number of hours in a day that he worked, or the conditions of his labor.

49. Refusal or resistance to a labor assignment was not treated as a legitimate exercise of autonomy. It was treated as a disciplinary infraction, and the response was to assign more labor.

50. GCCA employed a variety of systems that created a coercive environment. Those are, without limitation: A. Physical and Information Isolation, B. Hierarchical Structure, C. Spiritual Authority, D. The Cosmic Circle Ascension Chip Game, E. The Personality Integration Rehabilitation Program, F. Engineered Economic Dependency, G., Mandatory Counseling, H. Family Separation, I. Abuse of Legal Process, J. Shunning and Apostasy, the details of which are set out below.

**A. Physical and Informational Isolation**

51. GCCA's closed compound was located in a remote area of the high desert, geographically distant from any town, a location from which members had no independent means of departure.

52. Within the compound, members were denied the tools of connection to the

outside world: they had no unmonitored access to telephones, the internet, or outside media, and contact with any person outside GCCA was restricted, monitored, and subject to discipline.

53. Deprived of outside relationships, outside information, and any external point of reference against which to measure their treatment, members were left wholly dependent on GCCA for material survival, social connection, and their very understanding of reality. This was a deliberate mechanism that eliminated members' practical ability to leave, foreclosed any outside source of support or rescue, and amplified the coercive force of every other system described herein.

54. Because GCCA was the sole source of every member's food, shelter, and daily necessities, and because members had limited ways to get to the outside world and no place to go, stopping work was not a realistic option: a member who stopped working had nowhere else to live and nothing to live on.

55. All of this ensured that departure from GCCA was not a matter of walking out. Members who wanted to leave generally had to escape — planning in secret, concealing their intentions, and leaving with nothing, because any openly expressed desire to leave invited intervention, escalating discipline, and retaliation.

56. As he grew into a teenager, Nikai's exposure to the outside world continued to be limited. He was not permitted to have any outside educational opportunities. He had no electronic devices that reached outside of GCCA's firewall. Having been separated from his mother shortly around age five, he was completely dependent on GCCA. GCCA Leadership's determinations dictated every aspect of his life, including the labor he was forced to perform.

57. Nikai did not receive a phone until he was approximately seventeen. That device was an old, service-less Samsung phone GCCA issued for limited functions. It connected only to

GCCA's Wi-Fi, which was configured to block internet access at pinned IP addresses, so that the phone could be used to reach and direct a member at will but not to contact anyone outside GCCA. Nikai had no unmonitored outside internet access until he secretly circumvented GCCA's firewall in or about May 2023. Before that, his only outside access came through the work computers at Global Change Media which were monitored.

58. GCCA's monitoring and control extended to pervasive surveillance. Cameras were installed throughout the property, and on information and belief, footage was retained long enough to be preserved and reviewed. The community's Wi-Fi and devices were private and monitored, so that communications and activity could be traced. Members could not freely make telephone calls. Indeed, as a child, Nikai could not make calls at all, and the flip phones that members could sign out for approved trips were subject to review of their call records. When members left, GCCA reviewed those call records to identify whom the departing member had contacted and, on information and belief, used that information to locate former members — at times to confront them in person and pressure them to return.

**B. Hierarchical Structure and Coercive Control**

59. Authority within GCCA is stratified and absolute. Senior leaders — Delevin (until his death), Chase, and Tiyiendea DellErba — issued directives governing all aspects of daily life and labor. Below them, designated elders such as Lilly and Cunningham, along with other supervisors and enforcers, monitor compliance, assign work, conduct mandatory counseling sessions, and impose consequences for perceived disobedience or spiritual deficiency.

60. Below the elders, GCCA employs designated supervisors, counselors, and handlers who monitor members, implement discipline, assign daily labor, restrict access to housing and family contact, and escalate enforcement to leadership when members resist or

question directives. These enforcers operate as agents of GCCA Leadership, carrying out policies designed to maintain total control over members and extract maximum labor value.

61. Advancement within GCCA depends on obedience, labor output, and conformity to organizational expectations. Members' standing is publicly displayed on a "Members List" posted within the compound, showing their hierarchical rank. Demotion on the list results from perceived disobedience, insufficient labor, questioning of leadership, or other actions deemed spiritually deficient. Demotion carries severe consequences, including loss of privileges, increased surveillance, mandatory disciplinary programs, and potential separation from family members.

62. Nikai had limited contact with his mother and his biological father was not present to guide him. Consequently, he learned how to survive from the designated supervisors, counselors, and handlers who monitored him, subjected him to grueling work schedules, and maintained total control over his life. He observed what happened to adults who were subjected to the hierarchical ranking on the Members List. He saw that members found to be spiritually deficient faced severe consequences — including loss of privileges, increased surveillance, and more work. He learned that survival depended on complete obedience, on never expressing doubt, and on working when and where he was told, for as many hours as he was told.

63. The same pressure governed illness and injury. Within GCCA, a member who could not work was regarded as failing to pull his weight, and Nikai absorbed that judgment from childhood. He routinely worked while sick, because he understood that if he did not, he could be subject to deprivation and punishment.

64. GCCA also controlled members' access to medical care: a member could not obtain outside medical treatment without the approval of an elder or GCCA Leadership. This

control over members' medical care operated as a further means of coercion and dependency, reinforcing that even members' health and bodies were subject to GCCA's authority and compounding the pressure on members, including Nikai, to continue working rather than seek care they understood they were not free to obtain.

65. Nikai experienced his childhood as a prolonged struggle against people he could not escape and whose control he could find no way to break. He complied because he knew what non-compliance would cost.

**C. Spiritual Authority**

66. All determinations of spiritual standing within GCCA were controlled exclusively by Delevin and GCCA Leadership. Those determinations carried direct material consequences for every aspect of a member's life, including housing, labor assignments, family relationships, and community standing.

67. By framing punishment as spiritual judgment, GCCA Leadership led members to experience discipline not as institutional control but as a deserved consequence they could not question.

68. GCCA Leadership treated labor as a measure of community standing. A member's willingness to work when, where, and as long as directed was counted as evidence of spiritual worth; insufficient labor was counted as spiritual deficiency, with all of the material consequences that designation carried, including loss of rank on the Members List, increased surveillance, disciplinary programs, and more work. Members were shown that to stop working was to fail spiritually, and that to fail spiritually was to lose their standing, their relationships, and their security within the only community they had.

69. Because spiritual standing was defined entirely by GCCA Leadership, it could be

conferred or stripped at will. Nikai witnessed members who had been treated as respected spiritual figures recast overnight as "defaulters," their every past act condemned, with the surrounding community adopting that judgment as its own. The lesson communicated to every member, including Nikai, was that one's standing, relationships, and safety within the community depended on continued conformity and could be revoked at any moment.

70. Children were subject to individualized written "programs" identifying their supposed spiritual deficiencies, which were discussed at meetings about the child. At approximately age sixteen, when Delevin determined that he was ready, Nikai was admitted to "Service," a weekly business meeting followed by a gathering lasting approximately six hours, which operated to bind members more tightly to the community and to ensure members had little leisure time to consider their circumstances.

**D. The Cosmic Circle Ascension Chip Game**

71. GCCA operated a formal peer-reporting and discipline mechanism known internally as the "Cosmic Circle Ascension Chip Game." Under this system, any community member could report any other member for any perceived failure of conformity, however minor. Reportable conduct was deliberately undefined. A member could be "chipped," reported, and sanctioned for a facial expression, a tone of voice, or any demonstration of dissatisfaction, however subtle.

72. The chip system conscripted the entire community into the work of surveillance and enforcement. Members were not merely permitted to report one another — they were required to do so. Failure to "chip" another member for perceived non-conformity was itself a "chippable" offense.

73. This mechanism eliminated the possibility of solidarity among members and

transformed every peer relationship into a potential monitoring relationship. "Chips" triggered escalating consequences including additional labor assignments, mandatory counseling sessions, and placement in the Personality Integration Rehabilitation Program ("PIRP"). Because any lapse in conformity or effort was subject to observation by any member at any time, and because "chips" reliably produced punishment, members understood that non-performance of their labor and any expression of dissent would be seen and sanctioned.

74. The "chip" system operated to ensure GCCA's labor regime ran smoothly by suppressing dissent before it could form and by compelling members to continue performing labor for GCCA under constant threat of report and reprisal.

75. Nikai experienced the Cosmic Circle Ascension Chip Game ("chipping") from each possibility the system created -- he was chipped, he witnessed others being chipped, and he was required to chip others. Chipping was pervasive and began as soon as he could read and write.

76. Being chipped required children like Nikai to complete a mandatory written "reflection form" for every chip he acquired every single day. He was required to spend the working day reflecting on his supposed failing and then writing his thoughts out longhand in careful cursive, sometimes carrying two or three chip reflection forms at once to complete, so that the chip process consumed his few unstructured hours.

77. Nikai had no ability to decline these "reflections." If he objected, he could be placed in a disciplinary "behavioral program" in which a child was given a sleeping mat, a single pillow, and one set of clothes to be washed each day, for a period lasting as long as three months.

78. Nikai avoided the behavioral program only through complete submission, having watched other children placed in it, in some instances for no identifiable infraction.

**E. The Personality Integration Rehabilitation Program**

79. GCCA maintained a formal institutional program called the Personality Integration Rehabilitation Program, known internally as PIRP. Marayeh "Linda" Cunningham ("Cunningham"), recently deceased, directed or supervised GCCA's counseling hierarchy and PIRP. On information and belief, Cunningham was previously associated with Synanon and introduced to GCCA methods derived from the confrontational "attack therapy" known as the Synanon Game. As practiced within GCCA, this method was used to monitor members, extract personal information about their lives, relationships, and perceived deficiencies, and enforce submission to leadership directives. Information gathered through PIRP was transmitted to GCCA Leadership and used to coordinate discipline and intervention.

80. Placement in PIRP was presented to members as both a disciplinary response to non-conformity and a source of profound communal shame. Members placed in PIRP were subjected to intensified schedules, increased mandatory counseling, and heightened surveillance, compounding the demands of their existing labor obligations and depriving them of adequate rest.

81. A member placed in PIRP could neither refuse to participate nor escape its sessions, in which he or she was confronted and attacked, often by multiple GCCA figures at once, and taught to regard his or her own objections and perceptions as personal defects.

82. Conducted without limit and sustained over extended periods, this confrontational regimen was designed to, and did, wear down members' capacity for independent judgment and free choice, until continued obedience to GCCA's demands — including its demand for uncompensated labor — no longer felt to the member like a choice he or she was free to refuse.

83. Because PIRP was imposed upon the individual and framed as his or her personal

failing, it also disciplined the community as a whole. Members who witnessed its use understood what non-conformity would cost them and were taught to attribute any distress of their own — including the distress of laboring without compensation under coercion — to their own personal deficiency rather than to the conditions GCCA imposed.

84. In this way PIRP secured not only the labor of the member subjected to it, but the continued compliance of every member who might otherwise have questioned the arrangement. GCCA also used PIRP to create debt bondage in certain members who were told that PIRP participation carried a cost of fifty thousand dollars which they were responsible for but obviously, could not pay.

85. Nikai was never placed in PIRP, but it affected him, nonetheless. He observed adult members subjected to it throughout his time in the community. He understood what the program was and who was placed in it, and he understood it as a consequence of non-conformity. Witnessing PIRP operate on the adults around him taught him what noncompliance would cost. It reinforced his understanding that continued obedience, particularly continued performance of labor, was not something he could refuse.

**F. Engineered Economic Dependency**

86. GCCA systematically deprived its members of the economic means to leave, beginning at entry. Members were required to liquidate all of their assets and turn the proceeds over to GCCA at entry, so that after joining, a member possessed no savings, no property, and no independent financial resources with which to exit.

87. GCCA further required members to execute documents providing that any money or property a member might later inherit would likewise be surrendered in full to GCCA, foreclosing another avenue by which a member might otherwise accumulate independent means

while living within the community. On information and belief, Nikai was required to sign such a document when he turned eighteen.

88. The combined effect was engineered destitution: members were stripped of the resources to leave on entry and prevented from acquiring such resources, thereafter, ensuring that departure was not merely emotionally and legally catastrophic but financially impossible. On information and belief, GCCA's leadership was responsible for drafting and implementing these coercive legal documents.

89. Having stripped members of every means of supporting themselves outside GCCA, Defendants relied on that engineered destitution to secure continued labor. For a member with no money, no bank account, and no independent means of support, to stop working and leave was to face destitution.

90. On information and belief, GCCA also exercised control over members' financial and legal identities, including by preparing and filing federal income tax returns in members' names, without their involvement or signature, and requiring members to endorse and surrender to GCCA any refund checks that resulted.

91. Engineered economic dependency operated on Nikai with particular efficiency because he was raised within GCCA from early childhood. GCCA did not need to require Nikai to liquidate assets or surrender an inheritance on entry, as it did with adult members, because Nikai entered as a young child and never possessed any assets, savings, or property for GCCA to take.

92. He was also never paid for any of the labor he performed over more than a decade, was never permitted to accumulate money or property of his own and had no bank account or independent financial resources of any kind. Money within GCCA was controlled

entirely by the organization. Obtaining any money at all required submitting a form routed through GCCA's approval channels. The result was that Nikai reached adulthood having never controlled a dollar of his own.

93. Nikai's economic dependency was compounded by his mother's own economic captivity within GCCA. Like other adult members, she had little or nothing of her own – on information and belief, she had surrendered whatever she had to the organization when she entered. Even had she wished to help Nikai leave, she had nothing of her own to give. Nikai understood this so completely that it never occurred to him to ask her for any money.

94. The practical result was that when Nikai turned eighteen, he had no driver's license, no Social Security card, no bank account, no income, and no work history outside GCCA's own enterprises. The only identity document he possessed was his birth certificate, which he retrieved from his mother when he turned eighteen. Nikai understood that he depended on GCCA for everything, and that to stop working was to risk losing everything, including food and shelter.

**G. Mandatory Counseling**

95. GCCA operated a mandatory counseling program administered by Cunningham, together with a group of elder handlers assigned to individual members. The counseling program was not therapeutic in any meaningful sense. It functioned as an instrument of compliance designed to reverse blame, suppress dissent, extract confidential disclosures, and enforce GCCA Leadership's directives regarding members' conduct and attitudes. Information that members disclosed in counseling was reported to GCCA Leadership and used to calibrate further discipline.

96. GCCA structured its counseling practices to maximize the institution's power

over the member and to deny the member any stable source of support independent of GCCA Leadership. Handlers were deliberately rotated to prevent members from forming trusted relationships, and sessions were frequently conducted not as private meetings but as group proceedings designed to isolate and overwhelm the member.

97. Nikai was placed in GCCA's mandatory counseling program as a child, at approximately age nine. Counseling was not voluntary and it was not a source of support, although it was presented as such. Nothing was confidential. Counselors wrote reports of anything Nikai disclosed and sent them to Delevin and Individual Defendants On one occasion, Nikai told his counselor that he wanted to travel and at Service, Delevin shamed him for not being grateful for everything that was being done for him.

98. When Nikai was accused of doing something wrong, he was told the day, time and place of a counseling meeting he was required to attend. Usually, he met with his assigned counselor alone. However, if another member complained about him, that member attended as well, and the session turned into a meeting to go over the complaint.

99. Counseling was also a way for Nikai's counselor to deliver criticisms of Nikai that Delevin chose not to deliver to Nikai himself. For a period, Nikai's assigned counselor was Defendant Amadon DellErba, the same leader GCCA had designated as Nikai's "cosmic father" and who directed Nikai's labor at Global Change Media and at his personal residence.

100. Through Mandatory Counseling, Nikai understood that slackening his work would be reported and punished.

**H. Family Separation**

101. GCCA Leadership utilized the severance of family bonds as a way to punish non-compliance and compel obedience. When a member resisted or questioned leadership, GCCA

could separate the member from his or her spouse and children through institutional directive — assigning separate counselors to recharacterize the non-compliant member as a danger or spiritual liability, physically relocating the member away from the family, and imposing supervised-visitation requirements under which any contact with a member's own children required prior leadership approval and elder supervision.

102. Another use of family separation was to remove young children from parents as a matter of course, just as Nikai was separated from his mother. Having been raised among rotating caregivers, Nikai had no parent or parent figure whose primary loyalty was to him rather than to Delevin, GCCA, and the Defendants. This lack of a parent caused him to live in survival mode, where just "putting his head down" in complete compliance was the only way to safely survive.

103. When Nikai was approximately fourteen, GCCA Leadership, including Individual Defendants, designated Amadon DellErba as his "cosmic father," demonstrating again to Nikai that his most intimate family relationships, his biology, and his identity were not his own but were under the control of GCCA Leadership.

**I. Abuse of Legal Process**

104. GCCA used legal instruments and formal legal process as tools of coercion and control. As a condition of membership, GCCA required parents to execute documents providing that if a parent left the organization, the children of the relationship would remain in the custody of the parent staying with GCCA, or in the custody of GCCA itself.

105. GCCA, through its leadership including individual Defendants, drafted and administered documents purporting to require parents who left GCCA to leave their children behind and to relinquish their parental rights, and participated in custody and divorce

proceedings in which GCCA sought to prevent departing parents from obtaining custody of their children. These provisions expressly tied the threatened loss of parental rights to departure from GCCA. Together with GCCA's control of members' financial resources, they placed parents in the position of remaining within GCCA and continuing its mandatory labor assignments or leaving without their children and without independent means of support.

106. Delevin used Nikai's mother to control him, and through the force and coercion on his mother, used her to enforce and discipline Nikai if he did not perform labor for Defendants. Nikai would regularly be "chipped" by GCCA members for failing to complete, not satisfactorily finishing, or "complaining" about work as assignments. In retaliation, the Defendants would shame both Nikai and his mother in the community. Nikai learned that failing to work as directed would cost him damage to not only his reputation in the community, but also his mother's reputation. When Nikai was "chipped" or otherwise disciplined for failing to perform labor to Defendants' standards, Defendants' shame of him and his mother led to Nikai's mother becoming angry with Nikai and withdrawing affection from him. Nikai also grew up hearing stories about the screaming and community shaming that parents inflicted on their own children. Nikai, who already lost his father at a very young age, performed work directed by Defendants because he did not want to lose his mother too. Upon information and belief, this process of weaponizing parents against their children was part of Defendants' Systems of Control to facilitate the compelled labor of minors.

107. GCCA Leadership knew that members were required to perform uncompensated labor. Its preparation and implementation of these departure-conditioned custody arrangements were part of the means through which GCCA pressured members to remain and continue providing that labor.

108. This use and threatened use of law and legal process to compel labor and compliance, extract financial payment, eliminate parental rights, and impose the costs of exit constituted an abuse of legal process within the meaning of 18 U.S.C. § 1589(a)(3) and was a coordinated, institutionalized feature of GCCA's coercive system.

109. At approximately age eighteen — as soon as he reached the age of majority — Defendants required Nikai to sign a document assigning away his rights in the creative work he had produced. Age eighteen was the first time in Nikai's life that he was capable of owning property in his own right, and requiring him, at that very threshold, to sign those rights away was designed to ensure that he understood that if he left GCCA he would have nothing. The document was presented as mandatory and non-negotiable, and Nikai was not given the option to seek counsel nor was one provided by Defendants. Nikai understood it to mean that the only way to keep his music was to remain within GCCA and continue working for Defendants: if he stayed, he could never lose it, and it would not matter who nominally held the copyrights or other rights to it; but if he left, he would lose it. From Nikai's perspective, that was the purpose of the creative-rights document — to bind him to GCCA by ensuring that leaving meant the loss of the one thing that was his.

110. This use and threatened use of legal instruments and legal process to control members' property, appropriate the fruits of their labor, and impose the costs of exit constituted an abuse of legal process within the meaning of 18 U.S.C. § 1589(a)(3).

**J. Shunning and Apostasy**

111. Departure was characterized within GCCA as apostasy, and former members were treated accordingly as traitors and defectors. A member who escaped was understandably a dangerous threat to the ability to keep other members and their labor within the organization.

Contact between current members and defectors was prohibited or strongly discouraged. Members who expressed sympathy for or maintained communication with a departed member risked discipline themselves.

112. For a member raised inside GCCA, the loss that accompanied departure was not merely the withdrawal of a congregation's fellowship. It was the simultaneous loss of every relationship, every source of shelter and sustenance, and the only world the member had ever known.

113. Nikai witnessed GCCA's practice of vilifying those who left — a person esteemed one day as a "godly minister" recast the next as a "defaulter" whose every prior act was condemned, through an engineered mob dynamic in which the whole community adopted the same view. Since leaving, Nikai has received hostile and condemnatory messages conveying that he was condemned for having left.

114. His mother's contact has itself followed this pattern. She has reached him only intermittently, with messages containing dire warnings of his impending death.

115. The effect has been to sever, as a consequence of his departure, the one family relationship Nikai had.

116. Nikai knew, long before he left, how GCCA would treat him if he stopped working and left. He would be labeled a "defaulter" whose every past act would be condemned by the entire community, including his mother. The messages he has received since leaving, relaying Delevin's warnings that he had chosen wrongly and abandoned his destiny, confirm what he had long understood.

## VI. NIKAI'S COMPELLED LABOR AND ESCAPE

**A. The Progression of Nikai's Compelled Labor**

117. From an early age, GCCA directed Nikai's labor for the benefit of GCCA and its affiliated commercial ventures. What began as farm work at seven or eight escalated into heavy, skilled, and commercial labor across GCCA's businesses and properties before he was even a teenager. He was never paid for any of this work, at any age.

118. Even as a young child, Nikai's days were structured around labor alongside schooling. He attended some school when he was very young but then twice a week he began the morning with agricultural work before school. Agricultural work also served as punishment: a child could be "sent to the garden" for a full day, at any time, for any perceived misbehavior. By approximately age eleven, Nikai was no longer in full-time school; schooling became erratic, compressed into a few months at a time (often in colder weather), and subject to change depending on the many needs of the GCCA Enterprise.

119. Nikai's agricultural labor spanned the full range of GCCA's large farming operation, which occupied roughly 80–100 acres of the compound. Beginning at age seven or eight, his tasks included sifting and re-potting soil, propagating and transplanting seedlings, and harvesting, washing, and packing produce in the barns. The operation encompassed extensive greenhouses and propagation houses for specialty crops alongside roughly fifty acres of row crops such as onions and garlic. The produce Nikai's labor helped grow and process did not merely feed the community: it supplied GCCA's "Food for Ascension" café operation, was sold to the public through paid monthly produce shares and was distributed to GCCA's paid employees as part of their compensation. During his teenage years, Nikai also performed butchering of animals for meat under the direction of Lilly.

120. From approximately age eight, GCCA also compelled Nikai to undertake

intensive musical training — roughly half an hour of practice daily plus a one-to-two-hour lesson each week, sustained for approximately six to seven years.

121. Nikai did not choose to play the piano or to study music. He was placed in piano instruction at approximately age eight over his objection and was told he could choose another instrument only after years more study.

122. Nikai's compelled musical labor was commercialized from a young age. As a child, Nikai performed in GCCA's children's choir, which gave numerous public performances each year. When Nikai was approximately nine years old, the children recorded a full album that GCCA distributed and sold, and CDs were offered for sale at the choir's public performances to raise money for GCCA. Later, in approximately 2019 to 2020, Nikai played piano for, and sang in, a roughly fifty-piece choir associated with GCCA's school. These choral activities preceded, and then overlapped with, Nikai's placement in three bands beginning in approximately 2021.

123. Music was not incidental to GCCA — it was embedded in the community's belief system (the teaching was that creation itself was "sung" into existence and that everything is vibration) and children were raised to play and perform. As Nikai grew, GCCA placed him in three bands, beginning in about 2021 or early 2022. Nikai's years of uncompensated musical training, recording, and performance were framed to him not as labor for GCCA's commercial media enterprise but as participation in a creative mission — a characterization that conveniently obscured the commercial nature of the work and the fact that he was never paid for it. In addition to performing and re-recording the copyrighted repertoire of GCCA's leadership, Nikai wrote a substantial body of his own original music during his time in the community, which he was forced to sign over when he turned eighteen.

124. Beginning at approximately age fourteen, in or around 2019, GCCA put Nikai to

work in construction with Earth Harmony Builders, a GCCA-affiliated construction entity. The work included roofing (including tarring roofs), installing swamp coolers and air-conditioning units, and a large and varied volume of other construction tasks requiring the use of power tools and heavy equipment. This labor was characterized by GCCA as a “mentorship” or “internship.”

125. By approximately 2019, Earth Harmony Builders was largely occupied with building on GCCA’s own property. Nikai’s construction labor therefore inured entirely to GCCA’s internal benefit — the physical expansion of its own compound.

126. Beginning at approximately age fourteen, Nikai was also assigned to do landscaping work using commercial landscaping equipment. By approximately age fifteen or sixteen, this work was full-time, and it continued until he left. His landscaping and grounds labor — mowing, weed-whipping, tree-trimming at heights, pruning, painting, sanding, and related construction was performed across GCCA’s properties, including weekly work at the Soulistic properties and at a GCCA-connected property known as the Magic Garden located near the Soulistic Healing Center in Tubac, Arizona.

127. The work was managed by Defendant Tiyiendea DellErba. Work was performed whenever she directed. Landscaping equipment included riding mowers, chainsaws, pole saws, and weed trimmers; tree-trimming was performed from ladders, from rooftops, and in the trees themselves, including chainsaw work at height.

128. GCCA also put Nikai to work in its commercial hemp operation, marketed as Mystic Farms, performing the full range of hemp labor — cultivation, hand-pollination, and harvesting. This occurred at approximately ages fifteen and sixteen, over roughly one to two years, when Nikai (and the other high-school-aged children) were removed from school for months at a time to work the crop, approximately twelve hours a day on average — sometimes as

many as fourteen. Nikai's labor also fed GCCA's media and music enterprises. He was required to learn and perform the copyrighted musical repertoire of GCCA's leadership — including sets of roughly twenty-five songs — which were recorded in GCCA's professional recording studio and released commercially on streaming platforms. He also shot and edited video of live performances and other content for Global Change Media, GCCA's media venture. The two operations were integrated: Nikai would perform, film the performance, and then produce and upload the resulting video.

129. GCCA invested heavily in this enterprise, maintaining an elaborate recording studio. Live performances were recorded studio sessions, edited and then released across platforms. Global Change Media had outside-client revenue during Nikai's time performing this work — including the ticketed public performances on GCCA's property and the commercial video/drone work for outside clients through Magic Land Realty. Nikai received none of it.

130. The labor GCCA assigned Nikai as a child was physically dangerous. From approximately age eleven, he worked on roofs, including tarring roofs, installing swamp coolers, and air-conditioning units. As a teenager, he operated chainsaws, including from ladders and from rooftops. At fifteen and sixteen, he worked in the hemp fields for shifts of up to twelve hours, wearing masks that were not rated for the dust. Federal child labor regulations consider all roofing occupations, including the installation and servicing of heating, ventilation, and air-conditioning equipment on roofs, and the operation of chain saws to be too hazardous for the employment of minors under eighteen years of age. 29 C.F.R. §§ 570.33, 570.65, 570.67.[2]

131. Throughout these years, GCCA's labor demands displaced Nikai's education. His labor was repeatedly reframed as "internships" and "mentorships," deliberately blurring the line between labor and schooling. Formal education was partial at best; much of the time recorded as "school" was not, in fact, school. On information and belief, GCCA manipulated attendance records to overstate the actual hours of education Nikai received.

132. Every time GCCA had to choose between Nikai's well-being, his safety, his education, and his labor, the GCCA need for labor won out. These choices starkly reveal what the Systems of Coercion were designed to accomplish: not health, not safety, not the well-being and welfare of children, but first and foremost the extraction of labor at any cost.

133. At no point did Nikai control whether he worked, what tasks he performed, the hours he kept, or the conditions under which he labored. His assignments were dictated and enforced by GCCA's leadership and hierarchy through the same coercive mechanisms that governed every other aspect of his life. The labor he performed — construction that built out GCCA's compound, landscaping that maintained its revenue-generating properties, hemp cultivation for its commercial product line, and music and media released for commercial and promotional benefit — generated value and revenue for GCCA's network of enterprises. This was not the ordinary work a child does for a family; it was the extraction of uncompensated labor to build and run commercial operations.

[2] Federal child labor regulations prohibit all roofing occupations, including the installation and servicing of heating, ventilation, and air-conditioning equipment on roofs, as well as the operation of chain saws, to be particularly hazardous for minors under eighteen. 29 C.F.R. §§ 570.65, 570.67. They separately bar fourteen- and fifteen-year-olds from construction work, from operating power-driven equipment such as lawn mowers and trimmers, and from all work requiring ladders or scaffolds. 29 C.F.R. § 570.33(b), (e), (g), (n)(4). And they permit no covered employment of children under fourteen at all. 29 C.F.R. § 570.119.

**B. Continuation of the Forced Labor into Adulthood**

134. Nikai turned eighteen on May 11, 2023. His compelled labor did not end there. It continued, without interruption and in the same form, for approximately five more months, performed now as an adult — until he escaped. He was never paid for this adult labor, either.

135. Reaching the age of majority did not give Nikai a means of leaving. But it gave him, for the first time, the capacity to try. He had no identification, no money, no bank account, no credentials, and no outside relationships from which to build a life. During those five months, between the time he turned eighteen and the time he left, he retrieved his birth certificate, found a way around GCCA's firewall to the outside world, and secured outside help. He left at the first opportunity those steps made possible, approximately five months after his eighteenth birthday.

**C. Nikai's Escape from GCCA**

136. In or around October 2023, Nikai left GCCA. Because he had been raised entirely inside the community and had no outside means, relationships, or place to go, leaving was not a matter of simply walking away — it required an escape planned in secret, under constant fear of discovery.

137. He left by climbing over the compound's perimeter fence at night and jumping down into the Arizona desert, with essentially nothing but the help of a limited outside support structure of an ex-GCCA member, who had escaped in 2019. Nikai deliberately took almost nothing — not even a guitar he had long played — because the instruments, like everything else, belonged to GCCA, and he feared being accused of theft if he removed anything the organization could claim was not his. He had his birth certificate, the clothes on his back, and no money of his own.

**<u>DEFENDANTS' INVOLVEMENT IN NIKAI'S FORCED LABOR</u>**

**A. Each Defendant Participated in and Facilitated Nikai's Forced Labor, Accomplished Through Force, Fraud, and Coercion**

138. Defendants obtained Nikai's labor, and participated in and facilitated the obtaining of his labor, through an interlocking system of force, fraud, and coercion—including physical and informational isolation, a rigid disciplinary hierarchy, the abuse of spiritual authority, peer surveillance and reporting, confrontational "rehabilitation," engineered economic and financial dependency, mandatory counseling, family separation, the abuse of legal process, punishments and control tactics tied into reputation in the community, and the threat of shunning—by which Defendants eliminated Nikai's ability to refuse labor, assert autonomy, or leave.

139. Defendants employed force and the threat of serious harm. From approximately age eleven, Nikai was put on roofing and construction crews and made to tar roofs and install swamp coolers and air-conditioning units at height; as a teenager he operated chainsaws from ladders and rooftops; and at approximately ages fifteen and sixteen he worked shifts of up to twelve to fourteen hours hand-pollinating flowering hemp while wearing a mask not rated for the dust. He was made to work while sick, because he understood that a member who could not work was treated as failing to pull his weight and could face deprivation and punishment. A child who did not comply could be "sent to the garden" for a full day of labor at any time, stripped of his bed and belongings for as long as three months, or placed in a disciplinary "behavioral program" in which the child was given a sleeping mat, a single pillow, and one set of clothes to be washed each day, for a period lasting as long as three months.

140. Defendants employed coercion through engineered economic dependency and threats of serious psychological, reputational, and relational harm. Nikai was never paid for any

labor over more than a decade, was never permitted a bank account or money of his own, and reached adulthood having never controlled a dollar—obtaining any money at all required submitting a form routed through GCCA's approval channel. By the time Nikai turned eighteen he had no driver's license, no Social Security card, no bank account, no work history outside GCCA, and not a single dollar to his name.

141. Defendants reinforced that dependency through constant surveillance by cameras and monitored devices, a public "Members List" on which demotion for insufficient labor carried loss of privileges and increased discipline, the "Cosmic Circle Ascension Chip Game" that conscripted every member into reporting one another, and the threat of being labeled a "defaulter" and shunned, as Nikai has been since leaving.

142. Defendant GCCA participated in and facilitated Nikai's forced labor through force, fraud, and coercion. GCCA engineered and enforced, as institutional features of the organization, each of the Systems of Coercion described throughout this Complaint: physical and informational isolation on its remote, fenced 227-acre compound; a stratified hierarchy of leaders, elders, and handlers who assigned work and imposed discipline; the chip-reporting and "behavioral program" systems; mandatory counseling whose contents were reported to leadership; and engineered economic dependency—and deployed them as a unified method to compel the uncompensated labor of its members, including Nikai, as the central purpose of the community's operations.

143. GCCA directed Nikai's labor assignments centrally and treated any refusal or resistance not as a legitimate exercise of autonomy but as a disciplinary infraction, the response to which was to assign still more labor.

144. Defendant Delevin participated in and facilitated Nikai's forced labor through

force, fraud, and coercion. Delevin founded GCCA, held himself out as a prophet to whom members were required to bow as if to royalty, and exercised complete control over members' daily lives, finances, relationships, family structures, and labor assignments until his death in August 2025. He directed the deployment of members, including Nikai, across GCCA's commercial and nonprofit operations and enforced compliance through economic dependency, surveillance, mandatory counseling, family separation, disciplinary programs, and threats of serious harm for resistance or exit.

a. Delevin controlled all determinations of standing in the community, which he could confer or strip at will, framing discipline as deserved spiritual judgment and treating a member's willingness to work when, where, and as long as directed as the measure of spiritual worth.

b. Delevin dictated Nikai's family arrangements as a tool of control: Nikai was separated from his mother within months of arriving and placed among rotating caregivers at Delevin's direction, and at approximately age fourteen, Delevin's leadership designated Amadon DellErba as Nikai's "cosmic father."

c. Delevin received the reports that Nikai's counselors prepared of anything Nikai disclosed, and on one occasion, after Nikai told his counselor he wanted to travel, Delevin shamed him at "Service" for not being grateful for everything being done for him.

d. Delevin commercialized Nikai's compelled labor directly: the repertoire Nikai was made to record and perform consisted of Delevin's own songs, re-recorded commercially through Global Change Media, and at approximately age eighteen Nikai was required to sign a document assigning away his rights in the creative work

he had produced.

145. Defendant Chase participated in and facilitated Nikai's forced labor through force, fraud, and coercion. As co-founder and a senior member of GCCA Leadership, known within GCCA as "Niann," and as one of Delevin's wives who served as his second-in-command, Chase exercised authority over family structure, discipline, and labor practices affecting members including Nikai. She participated in the leadership meetings where operational decisions, including the use of members' uncompensated labor—were made, and possessed direct, organization-wide knowledge of GCCA's labor practices, its disciplinary and control mechanisms, and its internal handling of misconduct. Through her authority within GCCA Leadership, and through her roles as sole director and president of Soulistic and president of Avalon, Chase directed and participated in maintaining the institutional systems through which GCCA coerced members' work.

146. Defendant Tiyiendea DellErba participated in and facilitated Nikai's forced labor through force, fraud, and coercion. As a GCCA elder, one of Delevin's wives, and a principal lieutenant occupying a senior leadership position immediately beneath Delevin, Tiyiendea DellErba exercised authority over members' family relationships, labor assignments, discipline, and compliance, and issued or relayed directives through subordinate elders and supervisors. She had direct responsibility for and authority over Nikai's landscaping and construction labor, personally managing and directing it and determining when and where Nikai worked—work performed whenever she directed, using riding mowers, chainsaws, pole saws, and weed trimmers, and including tree-trimming from ladders, from rooftops, and in the trees themselves, including chainsaw work at height. As vice president of Avalon, she oversaw the construction and roofing operations that obtained the benefit of that labor.

147. Defendant Catherine Lilly participated in and facilitated Nikai's forced labor through force, fraud, and coercion. As an elder within GCCA Leadership known as "Centria" and the principal manager of GCCA's financial and operational systems, Lilly controlled lines of credit, property acquisitions, tax matters, and financial administration across multiple GCCA-affiliated ventures, serving as chief financial officer of Soulistic and sole director of Avalon. She administered the engineered economic dependency that made departure impossible for Nikai: money within GCCA was controlled entirely by the organization, obtaining any money required submitting a form routed through GCCA's approval channels, and Nikai was never paid and never permitted to accumulate money or property of his own. Lilly also personally directed Nikai's butchering labor during his teenage years.

148. Defendant Amadon DellErba participated in and facilitated Nikai's forced labor through force, fraud, and coercion. As Delevin's son and a member of GCCA Leadership and the head and chief executive of Global Change Media, Amadon DellErba directly oversaw and directed Nikai's compelled musical and media labor—his recordings and re-recordings of GCCA leadership's repertoire, his placement in bands and ticketed public performances on GCCA property, and his filming, editing, and production of video content, including commercial drone and video packages produced for outside clients through Magic Land Realty (for example, roughly $1,200 for two property videos) and production work for ticketed shows at the Sea of Glass venue. He also oversaw Camp Avalon and GCCA's Sedona-area rental properties, where Nikai performed landscaping, and Nikai performed weekly landscaping and painting—roughly five hours per week—at Amadon DellErba's personal residence. Amadon DellErba exercised dual coercive roles over Nikai: for a period, he served as Nikai's assigned counselor, using the mandatory counseling system to deliver criticism and enforce compliance, and he was designated

Nikai's "cosmic father," a family-control designation that reinforced to Nikai that his most intimate relationships and his identity were under GCCA's control.

149. Defendant Soulistic Medical Institute participated in and facilitated Nikai's labor through force, fraud, and coercion. Soulistic does not operate as an independent entity; it functions as an instrumentality of GCCA, and its sole director and officers—Defendants Chase (director and president/secretary) and Lilly (chief financial officer), and, upon information and belief, Delevin—were simultaneously members of GCCA Leadership. Through those officers, Soulistic directed and received years of Nikai's uncompensated landscaping, grounds, and construction labor at the Soulistic facilities and properties and at the GCCA-connected Magic Garden near the Soulistic Healing Center in Tubac, Arizona. Soulistic obtained Nikai's labor, and participated in and facilitated the obtaining of it, through the same Systems of Coercion described throughout this Complaint—the physical and informational isolation, disciplinary hierarchy, and engineered economic dependency by which Nikai's compliance was compelled—and it knew that his labor was obtained through those mechanisms. Soulistic continues to occupy and create revenue from Nikai's uncompensated work.

150. Defendant Avalon Universal Enterprises, Inc., operating under the trade names Earth Harmony Builders and ARC Roofing, participated in and facilitated Nikai's labor through force, fraud, and coercion. Avalon does not operate as an independent entity; it functions as an instrumentality of GCCA, and its sole director and officers—Defendants Lilly (sole director), Chase (president), and Tiyiendea DellErba (vice president), and, upon information and belief, Delevin—were simultaneously members of GCCA Leadership. Through those officers and its construction and roofing operations, Avalon directed and received years of Nikai's uncompensated construction and roofing labor, beginning at approximately age eleven and

intensifying at approximately age fourteen—including roofing and tarring roofs, installing swamp coolers and air-conditioning units at height, and operating power tools and heavy equipment—much of which built out and expanded GCCA's own compound. Avalon obtained that labor, and participated in and facilitated the obtaining of it, through the same Systems of Coercion described throughout this Complaint, and it knew that the labor was compelled through those mechanisms, including the threat of serious harm to a child who could not refuse an assignment. Avalon continues to occupy and create revenue from Nikai's uncompensated work.

151. Defendant Camp Avalon participated in and facilitated Nikai's forced labor through force, fraud, and coercion. Camp Avalon is operated and controlled by GCCA and managed by Defendant Amadon DellErba, a member of GCCA Leadership. Through Amadon DellErba, Camp Avalon directed and received Nikai's uncompensated landscaping and construction labor from approximately age eleven onward—including typical landscaping functions, the construction of campsites, tree trimming, and the building of rock barrier walls. Camp Avalon obtained that labor, and participated in and facilitated the obtaining of it, through the same Systems of Coercion described throughout this Complaint, and it knew that the labor was compelled through those mechanisms. Camp Avalon continues to occupy and create revenue from Nikai's uncompensated work.

152. Defendant Global Change Media participated in and facilitated Nikai's forced labor through force, fraud, and coercion. Global Change Media is operated, controlled, and financially supported by GCCA and is headed by Defendant Amadon DellErba, a member of GCCA Leadership, who publicly describes its workers as "full-time volunteers." Through Amadon DellErba, Global Change Media directed and received Nikai's uncompensated musical and media labor—his recordings and re-recordings of GCCA leadership's copyrighted repertoire

released commercially on streaming platforms, his placement in bands and ticketed public performances on GCCA property, and his filming, editing, and production of video content, including commercial drone and video packages produced for outside clients through Magic Land Realty and production work for ticketed shows at the Sea of Glass venue. Global Change Media obtained that labor, and participated in and facilitated the obtaining of it, through the same Systems of Coercion described throughout this Complaint—including GCCA's control over Nikai from early childhood and the commercialization of a skill compelled from a child—and it knew that the labor was compelled through those mechanisms. Upon information and belief, Global Change Media continues to exploit and profit from the recordings and performances produced through Nikai's uncompensated labor.

153. Defendant Avalon Slow Food(s) Enterprises, LLC, operating the commercial hemp business known as Mystic Farms, participated in and facilitated Nikai's forced labor through force, fraud, and coercion. Avalon Slow Food(s) Enterprises is operated and controlled by, and supplied with member labor by, GCCA. Through GCCA's leadership, it directed and received Nikai's uncompensated hemp labor—cultivation, hand-pollination, and harvesting—performed beginning at approximately age fifteen, in or about 2020, including shifts of up to twelve to fourteen hours while Nikai wore a mask not rated for the dust and during periods when Nikai and other high-school-aged children were removed from school for months at a time to work the crop. Avalon Slow Food(s) Enterprises obtained that labor, and participated in and facilitated the obtaining of it, through the same Systems of Coercion described throughout this Complaint, and it knew that the labor was compelled through those mechanisms. It processes and sells the hemp harvested through that labor under the Mystic Farms product line and continues to create revenue from Nikai's uncompensated work.

**B. Each Defendant Recruited, Harbored, Maintained, and Obtained Nikai's Forced Labor**

154. Through the conduct described throughout this Complaint, Defendants recruited, harbored, maintained, and obtained Nikai for the purpose of obtaining his labor, knowing and in reckless disregard of the fact that his labor would be and was obtained through force, fraud, and coercion.

155. Defendants drew Nikai into their closed community in or around 2010, at approximately four to five years old, through his mother, and from early childhood directed him into its commercial and nonprofit labor operations—beginning with agricultural work on the Garden at approximately age seven or eight (sifting and re-potting soil, propagating and transplanting seedlings, and harvesting, washing, and packing produce), escalating to roofing and construction crews at approximately age eleven, heavy equipment by approximately age fourteen, and full-time landscaping and hemp labor thereafter. From approximately age eight, Defendants began training Nikai in piano and music—not to develop his talent, but to build a commercial music operation using a skill compelled from a child.

156. Defendants confined Nikai within their remote, fenced, approximately 227-acre compound in the high desert, far from any town and with no independent means of departure; within months of arriving, Defendants separated him from his mother and placed him in the basement of a communal house called "the Ark," a structure with no true interior walls where he lived among strangers for years.

157. Defendants denied him contact with the outside world through cameras, monitored Wi-Fi, and a firewall; he received no phone until approximately age seventeen—an old, service-less device that connected only to GCCA's Wi-Fi and was blocked from the internet—and had no unmonitored outside internet access until he secretly circumvented

GCCA's firewall in or about May 2023.

158. Defendants sustained Nikai's labor over more than a decade through the Systems of Coercion—economic dependency, the Members List and demotion, the chip-reporting system and its daily "reflection forms," the "behavioral program," mandatory counseling reported to leadership, the Personality Integration Rehabilitation Program he witnessed used on adults, family separation, and the threat of shunning—treating any refusal to work as a disciplinary infraction answered with still more labor.

159. Defendants extracted Nikai's uncompensated labor across its agricultural, construction and roofing, landscaping, hemp, and media and music operations, paid him nothing at any age, and retained the full value and proceeds of that labor; his labor did not end when he turned eighteen but continued in the same form for approximately five more months until he escaped by climbing over the compound's perimeter fence at night in or around October 2023.

160. Each entity Defendant harbored, maintained, and obtained Nikai's forced labor as an instrumentality of GCCA—each operated and controlled by GCCA, staffed by members' uncompensated labor, and governed by the same GCCA Leadership—and each obtained and retained the benefit of Nikai's labor through the same coercive mechanisms described above.

161. Defendant GCCA harbored, maintained, and obtained Nikai's forced labor by confining him within its closed, fenced, approximately 227-acre compound from early childhood; by sustaining his labor over more than a decade through the Systems of Coercion it engineered and enforced; and by receiving and retaining the benefits of his labor for its various affiliated entities and for the community itself, including the uncompensated agricultural, construction, roofing, landscaping, hemp, and media and music labor he performed without pay at any age.

162. Defendant Soulistic harbored, maintained, and obtained Nikai's forced labor by directing and receiving years of his uncompensated landscaping, grounds, and construction services at the Soulistic facilities and properties and at the GCCA-connected Magic Garden near the Soulistic Healing Center in Tubac, Arizona, and by obtaining and retaining the benefit of that labor through its officers—Defendants Chase and Lilly, and upon information and belief Defendant Delevin—who were simultaneously members of GCCA Leadership. Soulistic continues to occupy and create revenue from that uncompensated work.

163. Defendant Avalon harbored, maintained, and obtained Nikai's forced labor by directing and receiving years of his uncompensated construction and roofing labor through its trade names Earth Harmony Builders and ARC Roofing—labor beginning at approximately age eleven and intensifying at approximately age fourteen, including roofing and tarring roofs, installing swamp coolers and air-conditioning units, and operating power tools and heavy equipment, much of which built out and expanded GCCA's own compound—and by obtaining and retaining the benefit of that labor through its officers Defendants Lilly, Chase, and Tiyiendea DellErba, who were simultaneously members of GCCA Leadership. Avalon continues to occupy and create revenue from that uncompensated work.

164. Defendant Camp Avalon harbored, maintained, and obtained Nikai's forced labor by directing and receiving his uncompensated landscaping and construction labor from approximately age eleven onward—including typical landscaping functions, the construction of campsites, tree trimming, and the building of rock barrier walls—and by obtaining and retaining the benefit of that labor through Defendant Amadon DellErba, who managed Camp Avalon on GCCA's behalf. Camp Avalon continues to occupy and create revenue from that uncompensated work.

165. Defendant Global Change Media harbored, maintained, and obtained Nikai's forced labor by directing and receiving his uncompensated musical and media labor—his recordings and re-recordings of GCCA leadership's copyrighted repertoire released commercially on streaming platforms, his ticketed public performances on GCCA property, and his filming, editing, and production of video content, including commercial drone and video packages produced for outside clients through Magic Land Realty and production work for ticketed shows at the Sea of Glass venue—and by obtaining and retaining the benefit of that labor through Defendant Amadon DellErba, its head and chief executive. Global Change Media continues to benefit from, and upon information and belief continues to exploit and profit from, the recordings and performances produced through that uncompensated labor.

166. Defendant Avalon Slow Food(s) Enterprises, LLC harbored, maintained, and obtained Nikai's forced labor by directing and receiving his uncompensated hemp labor—cultivation, hand-pollination, and harvesting—performed beginning at approximately age fifteen, in or about 2020, and by processing and selling the hemp harvested through that labor under the Mystic Farms product line. Avalon Slow Food(s) Enterprises continues to create revenue from that uncompensated work.

167. Defendant Delevin recruited, harbored, maintained, and obtained Nikai's forced labor by directing the deployment of members, including Nikai, across GCCA's operations; by establishing and maintaining the coercive systems and the closed, isolated compound in which Nikai was harbored; by dictating Nikai's rotating caregivers and his "cosmic father" and controlling his access to money, communication, and spiritual standing; and by determining the labor Nikai performed—including the re-recording of Delevin's own repertoire—and retaining its proceeds through GCCA and its affiliated entities.

168. Defendant Chase recruited, harbored, maintained, and obtained Nikai's forced labor by exercising authority over the family structure, discipline, and labor practices through which members, including Nikai, were held within GCCA and assigned their labor; by participating in the leadership meetings where the use of uncompensated labor was directed; and by managing, through her roles as director and president of Soulistic and president of Avalon, the operations that obtained and retained the benefit of his labor.

169. Defendant Tiyiendea DellErba recruited, harbored, maintained, and obtained Nikai's forced labor by exercising authority over members' family relationships, labor assignments, discipline, and compliance; by issuing and relaying the directives that implemented GCCA's coercive control; and by taking direct, hands-on responsibility for Nikai's landscaping and construction labor—assigning it, managing it, and determining when and where he worked and with what equipment—thereby obtaining that labor for GCCA and Avalon.

170. Defendant Catherine Lilly recruited, harbored, maintained, and obtained Nikai's forced labor by administering the engineered economic dependency—the control of all money, the form-and-approval system for any funds, and the denial of wages—that harbored and maintained Nikai by making departure financially impossible; by managing the finances and accounting of GCCA, Soulistic, and Avalon, the entities that obtained his labor; and by directing his butchering labor while the entities profited and he was paid nothing.

171. Defendant Amadon DellErba recruited, harbored, maintained, and obtained Nikai's forced labor by directing his commercial musical and media labor for Global Change Media and his landscaping at Camp Avalon, the Sedona-area properties, and his own residence; by maintaining his compliance through the mandatory counseling system as Nikai's assigned counselor; and by reinforcing GCCA's control over him as his designated "cosmic father,"

thereby obtaining and retaining the value of his labor for GCCA and its media enterprise.

**B. GCCA, Its Leadership, and Its Entities Knowingly Benefited from Forced Labor**

172. GCCA, its leadership, and its related entities knowingly benefited, financially and otherwise, from the uncompensated value of members' labor, including Nikai's labor, and knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform that uncompensated labor through coercion.

173. Defendant GCCA knowingly benefited, financially and otherwise, from its members' uncompensated labor, including Nikai's labor, and knew, or in the exercise of reasonable care should have known, that such labor was obtained through coercion as follows:

a. GCCA obtained Nikai's free agricultural labor on its farm, the Garden; his free construction and roofing labor building out its physical compound and infrastructure; his free landscaping and grounds labor maintaining its properties; his free hemp cultivation and hand-pollination labor; his free commercial music and media labor; and his free domestic and service labor.

b. GCCA further received the revenue generated by Nikai's work for GCCA and its affiliated commercial and nonprofit ventures, including the produce his agricultural labor grew and processed for sale through GCCA's "Food for Ascension" operation and paid produce shares; the construction and roofing work performed through Earth Harmony Builders and ARC Roofing; the landscaping of its revenue-generating properties; the hemp processed and sold under the Mystic Farms product line through Avalon Slow Food(s) Enterprises; and the recordings, performances, and video content released and sold through Global Change Media.

c. GCCA knew, or in the exercise of reasonable care should have known, based on its

financial records and through the participation and observations of its directors, officers, and agents, that its members, including Nikai, were compelled to perform that uncompensated labor through coercion.

174. Each and every Individual Defendant named herein knowingly benefited, financially and otherwise, from Nikai's uncompensated labor, and knew, or in the exercise of reasonable care should have known, that Nikai was compelled to perform that labor through coercion.

a. Each Individual Defendant exercised authority within GCCA Leadership and participated in the operation or management of GCCA and its affiliated entities, directing, supervising, or implementing the policies and practices through which GCCA obtained members' labor, and each either directed Nikai's labor or witnessed him performing it around the GCCA compound and its affiliated properties—including his agricultural work, construction and roofing, landscaping and grounds maintenance, hemp cultivation and hand-pollination, domestic and kitchen work, and musical and media production.

b. Each Individual Defendant knowingly benefited from the use of the structures Nikai built out, remodeled, and maintained for residential living and for GCCA's businesses, for hosting GCCA seminars, performances, and events, and for other purposes; from the receipt of food and domestic services derived from Nikai's agricultural and grounds labor; and from the music, recordings, and media Nikai produced. Nikai performed construction, roofing, landscaping, painting, and maintenance across GCCA's compound and affiliated properties, including at residences and offices belonging to the Individual Defendants.

c. Each and every Individual Defendant further reaped the benefits of the profits from Nikai's labor at GCCA's affiliated corporations and ventures, including GCCA, Soulistic, Avalon, Camp Avalon, Global Change Media, and Avalon Slow Food(s) Enterprises. Each Individual Defendant lived in nicer accommodations than ordinary GCCA members—including larger or private residences—and had access to personal vehicles, technology, and greater amenities and resources than ordinary members, including Nikai, were permitted; Nikai, by contrast, lived as a child in cramped, communal, shared quarters, such as the partitioned basement of the communal house known as "the Ark."

d. Upon information and belief, each Individual Defendant had access to credit cards connected to the shared bank accounts of Defendants GCCA, Avalon, and Soulistic, which they used for personal purchases, and accessed the proceeds of those entities—generated in part through Nikai's compelled labor—to acquire and maintain their residences, vehicles, and other amenities not afforded to ordinary GCCA members.

175. Defendant Delevin knew, or in the exercise of reasonable care should have known, that GCCA members including Nikai were compelled to perform uncompensated labor through coercion, and he knowingly benefited from that labor as follows:

a. Delevin exercised ultimate authority over GCCA's members, structure, doctrine, finances, labor systems, family arrangements, discipline, and affiliated entities, and personally established and maintained the coercive systems through which members' labor was obtained without pay, as detailed herein. Delevin directed the deployment of members, including Nikai, across GCCA's commercial and nonprofit operations, had access to and control over GCCA's and the related entities' financial records, and

knew the entities were receiving uncompensated labor.

b. Delevin, in consultation with the other Individual Defendants, dictated the major business decisions for Defendants GCCA, Soulistic, Avalon, Camp Avalon, Global Change Media, and Avalon Slow Food(s) Enterprises, and passed his decisions down to the other members of GCCA Leadership to execute. His decisions included determining the labor Nikai would perform and for whom—including his agricultural work on the Garden, his construction and roofing work for Earth Harmony Builders, his landscaping, his hemp cultivation for Mystic Farms, and his musical and media labor for Global Change Media. Delevin, through GCCA and its affiliated entities, kept all of the proceeds of the labor Nikai performed.

c. Delevin directed the commercialization of Nikai's musical labor, including Nikai's training from early childhood, his placement in GCCA's children's choir and in bands, and the recording and public performance of Delevin's own copyrighted repertoire, re-recorded commercially through Global Change Media.

d. Delevin regularly observed Nikai and other members performing uncompensated labor around the GCCA compound and its affiliated properties and saw the financial benefit reaped by himself and the entities he controlled.

e. Delevin knowingly benefited from the use of the structures Nikai constructed and maintained for GCCA's businesses and residential housing, for hosting GCCA seminars, performances, and events, and for other purposes; from the receipt of food and domestic services derived from Nikai's agricultural and grounds labor; and from the music and media produced through Nikai's compelled labor.

f. Delevin lived in a larger, private residence on the compound and had access to

multiple personal vehicles, technology, and amenities not afforded to ordinary GCCA members, including Nikai, who as a child lived in cramped, communal, shared quarters, such as the partitioned basement of the communal house known as "the Ark." Upon information and belief, Delevin had access to credit cards connected to the shared bank accounts of Defendants GCCA, Avalon, and Soulistic and used those credit cards for personal purchases.

g. Upon information and belief, Delevin accessed the proceeds of GCCA, Soulistic, Avalon, and the other affiliated entities—proceeds generated in part through the coerced labor of Nikai—to acquire and maintain his residence, his vehicles, and other amenities not afforded to ordinary GCCA members.

176. Defendant Chase knew, or in the exercise of reasonable care should have known, that GCCA members including Nikai were compelled to perform uncompensated labor through coercion, and she knowingly benefited from that labor as follows:

a. As co-founder and a senior member of GCCA Leadership, and as one of Delevin's wives, Chase regularly participated in leadership meetings in which the use of members' uncompensated labor was discussed; exercised authority over family structure, discipline, and labor practices affecting members, including Nikai; possessed direct, organization-wide knowledge of GCCA's labor and control practices; and otherwise participated in the coercive practices of GCCA as detailed herein.

b. Chase served as the sole director and as president and secretary of Defendant Soulistic and as president of Defendant Avalon, and in those capacities participated in the management of the commercial and nonprofit operations that obtained and

retained the benefit of Nikai's labor.

c. Chase witnessed Nikai performing uncompensated labor around the GCCA compound and its affiliated properties, including his landscaping, grounds, and construction work at the Soulistic facilities and properties.

d. Chase knowingly benefited from the use of the structures Nikai built and maintained, including the Soulistic facilities and properties Nikai landscaped and serviced; from the receipt of food and domestic services derived from his agricultural and grounds labor; and from her personal residence and its maintenance.

e. Chase lived in a larger, private residence on the compound and had access to personal vehicles, technology, and amenities not afforded to ordinary GCCA members. Upon information and belief, Chase had access to credit cards connected to the shared bank accounts of Defendants GCCA, Avalon, and Soulistic and used those credit cards for personal purchases.

f. Upon information and belief, Chase accessed the proceeds of GCCA, Soulistic, Avalon, and the other affiliated entities, generated in part through Nikai's compelled labor, to acquire and maintain her residence, her vehicles, and other amenities not afforded to ordinary GCCA members.

177. Defendant Tiyiendea DellErba knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform uncompensated labor through coercion, and she knowingly benefited from that labor as follows:

a. As a GCCA elder, one of Delevin's wives, and a principal lieutenant occupying a senior leadership position immediately beneath Delevin, Tiyiendea DellErba regularly participated in leadership meetings in which the use of members'

uncompensated labor was discussed; issued or relayed directives through subordinate elders and supervisors, including as to Nikai's labor; and otherwise participated in the coercive practices of GCCA as detailed herein.

b. Tiyiendea DellErba had direct responsibility for and authority over Nikai's landscaping and construction labor. She managed and directed that work, determining when and where Nikai labored, and regularly observed him performing it.

c. Tiyiendea DellErba served as vice president of Defendant Avalon, which operated through Earth Harmony Builders and ARC Roofing, and in that capacity oversaw the construction and roofing operations that obtained the benefit of Nikai's labor.

d. Tiyiendea DellErba knowingly benefited from the use of the structures Nikai built and maintained, including her personal residence and its maintenance; from the landscaping and grounds work Nikai performed; and from the receipt of food and domestic services derived from his agricultural labor.

e. Tiyiendea DellErba lived in a larger, private residence on the compound and had access to personal vehicles, technology, and amenities not afforded to ordinary GCCA members. Upon information and belief, Tiyiendea DellErba had access to credit cards connected to the shared bank accounts of Defendants GCCA, Avalon, and Soulistic and used those credit cards for personal purchases.

f. Upon information and belief, Tiyiendea DellErba accessed the proceeds of GCCA, Soulistic, Avalon, and the other affiliated entities, generated in part through Nikai's compelled labor, to acquire and maintain her residence, her vehicles, and other amenities not afforded to ordinary GCCA members.

178. Defendant Catherine Lilly knew, or in the exercise of reasonable care should have

known, that members including Nikai were compelled to perform uncompensated labor, and she knowingly benefited from that labor as follows:

a. As an elder within GCCA Leadership and the principal manager of GCCA's financial and operational systems, Lilly controlled financial matters including lines of credit, property acquisitions, tax matters, and financial administration across multiple GCCA-affiliated ventures; had access to and did observe GCCA's financial records; and otherwise participated in the coercive practices of GCCA as detailed herein.

b. Lilly managed the finances and accounting of the businesses and entities that obtained Nikai's compelled labor, including GCCA, Avalon, Soulistic, and its other commercial operations, serving as chief financial officer of Soulistic and sole director of Avalon. Lilly was aware that Nikai was not receiving wages for his compelled labor while the entities profited, and she knew the entities were receiving uncompensated labor.

c. Lilly directed Nikai's butchering labor and witnessed Nikai performing uncompensated labor around the GCCA compound and its affiliated properties.

d. Lilly knowingly benefited from the use of the structures Nikai built and maintained, including her personal residence and its maintenance; from the receipt of food and domestic services derived from his agricultural and grounds labor; and from the properties Nikai landscaped and serviced.

e. Lilly lived in a larger, private residence and had access to her own personal vehicle, technology, and amenities not afforded to ordinary GCCA members. Upon information and belief, Lilly had access to credit cards connected to the shared bank accounts of Defendants GCCA, Avalon, and Soulistic and used those credit cards for

personal purchases.

f. Upon information and belief, Lilly accessed the proceeds of GCCA, Soulistic, Avalon, and the other affiliated entities, generated in part through Nikai's compelled labor, to acquire and maintain her residence, her vehicle, and other amenities not afforded to ordinary GCCA members.

179. Defendant Amadon DellErba knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform uncompensated labor, and he knowingly benefited from that labor as follows:

a. As Delevin's son and a member of GCCA Leadership, Amadon DellErba exercised authority over members' labor; participated in the operation and management of GCCA and its affiliated entities; and otherwise participated in the coercive practices of GCCA as detailed herein.

b. Amadon DellErba is the head and chief executive of Defendant Global Change Media and, in that capacity, directly oversaw and directed Nikai's compelled musical and media labor—including Nikai's recordings, band performances, ticketed public shows, and the filming, editing, and production of video and drone content for Global Change Media and for outside clients. He also oversees Defendant Camp Avalon and GCCA's Sedona-area rental properties, at which Nikai performed landscaping labor.

c. Amadon DellErba served as Nikai's assigned counselor for a period and was designated Nikai's "cosmic father," and in those roles directed, supervised, observed, and had direct knowledge of Nikai's labor.

d. Amadon DellErba knowingly benefited from the use of the structures and grounds Nikai built and maintained, including the weekly landscaping and painting Nikai

performed at Amadon DellErba's personal residence; from the receipt of food and domestic services derived from Nikai's agricultural and grounds labor; and from the music, recordings, and media produced through Nikai's compelled labor, which Global Change Media continues to exploit and from which Amadon DellErba continues to profit.

e. Amadon DellErba lived in his own private residence and had access to personal vehicles, technology, and amenities not afforded to ordinary GCCA members. Upon information and belief, Amadon DellErba had access to credit cards connected to the shared bank accounts of Defendants GCCA, Avalon, Global Change Media, and Camp Avalon and used those credit cards for personal purchases.

f. Upon information and belief, Amadon DellErba accessed the proceeds of GCCA, Global Change Media, Camp Avalon, and the other affiliated entities, generated in part through Nikai's compelled labor, to acquire and maintain his residence, his vehicles, and other amenities not afforded to ordinary GCCA members.

180. Each and every entity Defendant named herein knowingly benefited, financially and otherwise, from Nikai's uncompensated labor, and knew, or in the exercise of reasonable care should have known, that Nikai was compelled to perform that labor through coercion. Each entity Defendant is operated and controlled by GCCA and does not function as a genuinely independent entity; each operates as an instrumentality of the GCCA venture, staffed by members' uncompensated labor and governed by the same GCCA Leadership that controls GCCA itself. Through officers and managers who were simultaneously members of GCCA Leadership, each entity Defendant knew that Nikai's labor was compelled through the coercive mechanisms described throughout this Complaint and obtained and retained the benefit of that

labor through those same mechanisms. Upon information and belief, the profits generated by Nikai's labor at these entities funneled back to GCCA, and each entity Defendant continues to occupy, use, or create revenue from Nikai's uncompensated work.

181. Defendant Soulistic knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform uncompensated labor, and knowingly benefited from that labor as follows:

a. Soulistic knowingly benefited, financially and otherwise, from Nikai's labor, including years of landscaping, grounds, and construction services performed at the Soulistic facilities and properties and at the GCCA-connected Magic Garden near the Soulistic Healing Center in Tubac, Arizona.
b. Soulistic knew, through its director and officers Defendants Chase and Lilly, and upon information and belief Defendant Delevin, that this labor was compelled through the coercive mechanisms described throughout this Complaint.
c. Soulistic, through its officers Defendants Chase, Lilly, and Delevin, who were simultaneously members of GCCA Leadership, obtained and retained the benefit of that labor through those same mechanisms.
d. Soulistic continues to occupy and create revenue from Nikai's uncompensated work.

182. Defendant Avalon knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform uncompensated labor, and knowingly benefited from that labor as follows:

a. Avalon knowingly benefited, financially and otherwise, from Nikai's labor for Earth Harmony Builders and ARC Roofing.
b. Earth Harmony Builders, a construction entity wholly owned and operated through

Avalon and GCCA, benefited, including by directly receiving revenue and profits, from years of unpaid construction and roofing labor Nikai performed beginning at approximately age eleven and intensifying at approximately age fourteen—including roofing and tarring roofs, installing swamp coolers and air-conditioning units, and operating power tools and heavy equipment—much of which built out and expanded GCCA's own compound.

c. Avalon knew, through its director and officers Defendants Lilly, Chase, and Tiyiendea DellErba, and upon information and belief Defendant Delevin, that this labor was compelled through the coercive mechanisms described throughout this Complaint.

d. Avalon, through its officers Defendants Lilly, Chase, and Tiyiendea DellErba, who were simultaneously members of GCCA Leadership, obtained and retained the benefit of that labor through those same mechanisms.

e. Avalon continues to occupy and create revenue from Nikai's uncompensated work.

183. Defendant Camp Avalon knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform uncompensated labor, and knowingly benefited from that labor as follows:

a. Camp Avalon knowingly benefited, financially and otherwise, from Nikai's landscaping and construction labor, performed from approximately age eleven onward, including the construction of campsites, tree trimming, and the building of rock barrier walls.

b. Camp Avalon is operated and controlled by GCCA and managed by Defendant Amadon DellErba, through whom it knew that this labor was compelled through the

coercive mechanisms described throughout this Complaint, and through whom it obtained and retained the benefit of that labor through those same mechanisms.

c. Camp Avalon continues to occupy and create revenue from Nikai's uncompensated work.

184. Defendant Global Change Media knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform uncompensated labor, and knowingly benefited from that labor as follows:

a. Global Change Media knowingly benefited, financially and otherwise, from Nikai's compelled musical and media labor, including his recordings and re-recordings of GCCA leadership's copyrighted repertoire released commercially on streaming platforms; his ticketed public performances on GCCA property; and his filming, editing, and production of video content, including commercial drone and video packages produced for outside clients through Magic Land Realty and production work for ticketed shows at the Sea of Glass venue.

b. Global Change Media is operated, controlled, and financially supported by GCCA and headed by Defendant Amadon DellErba, through whom it knew that this labor was compelled through the coercive mechanisms described throughout this Complaint, and through whom it obtained and retained the benefit of that labor through those same mechanisms.

c. Global Change Media received the benefit of the ownership of rights to Nikai's uncompensated work and received profits and revenues from selling his Nikai's work.

d. Global Change Media continues to benefit from, and upon information and belief continues to exploit and profit from, the recordings and performances produced

through Nikai's uncompensated labor.

185. Defendant Avalon Slow Food(s) Enterprises, LLC knew, or in the exercise of reasonable care should have known, that members including Nikai were compelled to perform uncompensated labor, and knowingly benefited from that labor as follows:

a. Avalon Slow Food(s) Enterprises knowingly benefited, financially and otherwise, from Nikai's uncompensated hemp labor, including cultivation, hand-pollination, and harvesting—performed beginning at approximately age fifteen, in or about 2020.

b. The hemp harvested through Nikai's labor is processed and sold today under the Mystic Farms product line operated by Avalon Slow Food(s) Enterprises.

c. Avalon Slow Food(s) Enterprises is operated, controlled, and supplied with member labor by GCCA, through whose leadership it knew that this labor was compelled through the coercive mechanisms described throughout this Complaint, and through whom it obtained and retained the benefit of that labor through those same mechanisms.

d. Avalon Slow Food(s) Enterprises continues to create revenue from Nikai's uncompensated work.

## DEFENDANTS' VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### A. RICO Persons

186. For purposes of 18 U.S.C. § 1962(c), each of the following individual Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3): the Estate of Anthony Joseph Delevin; Nancy "Niánn" Emerson Chase; Tiyiendea DellErba a/k/a Stacy Lee Myszka; Catherine "Centria" Lilly; and Amadon DellErba.

187. Each RICO Person is a natural person (or the estate of a natural person) and is legally distinct from the GCCA Enterprise described below, which comprises a structure of affiliated entities and associated individuals functioning together as a continuing unit with a shared purpose that is broader than, and exists apart from, any individual RICO Person.

188. Defendant Global Community Communications Alliance and the affiliated entity Defendants are not named as RICO "persons" for purposes of the § 1962(c) claim; they are components of the GCCA Enterprise through which the RICO Persons conducted the pattern of racketeering activity alleged herein.

**B. The GCCA Enterprise**

189. At all relevant times, the RICO Persons operated through an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "GCCA Enterprise").

190. The GCCA Enterprise consisted of GCCA; its affiliated commercial and nonprofit entities, including Soulistic Medical Institute, Avalon Universal Enterprises, Camp Avalon, Global Change Media, Sea of Glass Center for the Arts, Magic Land Realty, Avalon Slow Food(s) Enterprises, LLC (Mystic Farms), and related agricultural, hemp, media, and property operations; GCCA Leadership; and the designated supervisors, counselors, enforcers, and administrators who implemented leadership directives within GCCA's hierarchical structure.

191. The GCCA Enterprise had the common purpose of operating and sustaining GCCA, its properties, its commercial ventures, and all of its revenue-producing activities through a centrally controlled labor force of members who could easily be deployed among the various Enterprise operations without ordinary labor costs. To accomplish that purpose, the RICO Persons used the Enterprise's Systems of Coercion to compel members to perform uncompensated labor and to maintain their continued compliance with the Enterprise's labor

demands. The GCCA Enterprise functioned as a continuing unit for more than two decades, through a defined leadership hierarchy in which authority flowed from senior leadership to operational supervisors and enforcers.

192. In the alternative, GCCA is itself an enterprise within the meaning of 18 U.S.C. § 1961(4) — a legal entity whose affairs the RICO Persons conducted — and each RICO Person is distinct from GCCA.

**C. The RICO Persons' Roles and Predicate Acts**

193. Each RICO Person conducted or participated, directly or indirectly, in the conduct of the GCCA Enterprise's affairs by exercising direction, management, or control over its operations, conducting the affairs of the Enterprise as a whole and not merely his or her own affairs. No RICO Person merely provided services to or associated with the Enterprise. Each participated in directing its affairs, and each committed or knowingly benefited from the predicate acts, as alleged below.

194. Delevin. During his lifetime, Delevin exercised ultimate authority over GCCA and the GCCA Enterprise. He directed the deployment of members, including Nikai, among GCCA's commercial and nonprofit operations; established and maintained the system through which members' labor was obtained and controlled; exercised authority over members' daily lives, finances, relationships, family structures, labor assignments, and access to basic necessities; and enforced compliance with Enterprise directives through the coercive mechanisms alleged throughout this Complaint. Liability for Delevin's conduct is asserted against his Estate. Delevin knowingly obtained Nikai's labor by means of serious harm and threats of serious harm, and through a scheme, plan, or pattern intended to cause Nikai to believe that if he did not perform the labor assigned to him, he would suffer serious harm, in violation of

18 U.S.C. § 1589(a)(2) and (4). Delevin also knowingly harbored Nikai within GCCA's compound and obtained him for labor in violation of 18 U.S.C. § 1590(a). He did so repeatedly, from the time Nikai began laboring at approximately age seven or eight through Nikai's escape in approximately September 2023. Each instance in which Nikai's labor was obtained through those means constituted a separate predicate act. Delevin also enjoyed the privileges of leadership described in this Complaint, including superior housing, household help, cars, money or credit cards, and the freedom to travel and to come and go as he pleased.

195. Chase. Chase knowingly obtained Nikai's uncompensated labor through her direction and implementation of the Enterprise's labor and disciplinary practices. As GCCA's co-founder, Delevin's wife, and a senior member of GCCA Leadership, Chase exercised authority over members' labor, discipline, and family relationships. She participated in leadership meetings at which operational decisions affecting the community were made, and she issued directives governing members' daily lives and labor. Chase also served as sole director and president of Soulistic Medical Institute, an Enterprise entity for which Nikai performed years of uncompensated landscaping and construction labor. Through her participation in directing GCCA's labor and disciplinary practices, Chase was aware that members' labor assignments were coerced and mandatory and that the Systems of Coercion alleged above, including intensified discipline, surveillance, deprivation, and family separation, kept members, including Nikai, laboring. Chase knowingly directed and participated in maintaining those systems while managing Soulistic and other GCCA operations that obtained and retained Nikai's uncompensated labor. Through that conduct, Chase knowingly obtained Nikai's labor by means of serious harm or threats of serious harm, and through a scheme intended to cause him to believe that failure to perform assigned labor would result in serious harm, in violation of 18

U.S.C. § 1589(a)(2) and (4). Chase did so repeatedly throughout Nikai's years of labor for Soulistic and other Enterprise operations, and each such instance constituted a separate predicate act. As a senior member of GCCA Leadership, Chase also enjoyed privileges ordinary members did not, including superior housing, household help, cars, money or credit cards, and the freedom to travel and to come and go as she pleased. Her household help included members assigned to serve her.

196. Tiyiendea DellErba. Tiyiendea DellErba, an elder and senior member of GCCA Leadership, participated in the operation and management of the GCCA Enterprise by exercising authority over members' family relationships, labor assignments, discipline, and compliance with leadership directives; issuing or relaying directives through subordinate elders and supervisors; and directing and implementing policies designed to maintain control over members and ensure the continued performance of their labor. Tiyiendea DellErba also directly managed Nikai's landscaping and construction labor and served as vice president of Avalon Universal Enterprises. Tiyiendea DellErba knowingly obtained Nikai's landscaping and construction labor by means of serious harm and threats of serious harm, and through a scheme, plan, or pattern intended to cause him to believe that if he did not perform the labor assigned to him, he would suffer serious harm, in violation of 18 U.S.C. § 1589(a)(2) and (4). She set Nikai's work assignments and determined when and where he worked. She directed that work knowing that Nikai, a child raised within GCCA, could not refuse an assignment without facing the consequences imposed through the Systems of Coercion. She did so repeatedly, from when Nikai was approximately eleven years old through Nikai's escape in or around September 2023, and each instance constituted a separate predicate act. She also oversaw Nikai's butchering labor, together with Lilly. As a senior member of GCCA Leadership, Tiyiendea DellErba also enjoyed

privileges ordinary members did not, including superior housing, household help, cars, money or credit cards, and the freedom to travel and to come and go as she pleased. Her household help included members assigned to serve her.

197. Amadon DellErba. Amadon DellErba knowingly obtained and benefited from Nikai's labor through the Enterprise's Systems of Coercion. Amadon DellErba managed Camp Avalon and GCCA's Sedona-area rental properties and headed Global Change Media, where he directly supervised Nikai's media and music labor. He also personally benefited from Nikai's labor at his own residence. While Nikai worked full-time at Global Change Media, Amadon DellErba, as its head, assigned one of Nikai's workdays each week to landscaping and painting at Amadon DellErba's residence. As Delevin's son and a member of GCCA Leadership who directly supervised Nikai's labor, Amadon DellErba knew the institutional systems through which members were assigned labor and were compelled to comply with leadership directives. As a member of GCCA Leadership, Amadon DellErba also enjoyed privileges ordinary members did not, including superior housing, household help, cars, money or credit cards, and the freedom to travel and to come and go as he pleased. His household help included members assigned to serve him and his family.

198. By directing and supervising Nikai's labor with knowledge of the coercive circumstances compelling his compliance, Amadon DellErba knowingly obtained Nikai's labor by means prohibited by 18 U.S.C. § 1589(a). In the alternative, through his participation in the venture, Amadon DellErba knowingly received things of value, including Nikai's work at his residence and those privileges of leadership, knowing or in reckless disregard of the fact that the venture obtained labor through means prohibited by § 1589(a), in violation of 18 U.S.C. § 1589(b). Amadon DellErba did so repeatedly throughout Nikai's years of labor for Global

Change Media and at his residence, and each such instance constituted a separate predicate act.

199. Lilly. Lilly knowingly participated in and benefited from the Enterprise's obtaining of Nikai's uncompensated labor. Lilly was an elder and long-time member of GCCA Leadership and a principal manager of GCCA's financial and operational systems. She served as chief financial officer of Soulistic Medical Institute, an Enterprise entity for which Nikai was assigned to perform uncompensated landscaping and construction labor, and she controlled financial matters across other GCCA-affiliated ventures, including lines of credit, property acquisitions, tax matters, and financial administration. Lilly had personal knowledge of and participated in GCCA's Systems of Coercion. She enforced compliance with leadership authority and imposed consequences upon members who resisted that authority. Lilly participated in the management of Soulistic and other Enterprise operations that received and retained the economic benefit of Nikai's uncompensated labor. As an elder, Lilly also received privileges that ordinary members did not, including superior housing, household help, cars, money or credit cards, and the freedom to travel and to come and go as she pleased. Through her participation in managing those operations, Lilly knowingly received those privileges from the venture that obtained Nikai's labor, knowing or in reckless disregard of the fact that the venture obtained labor through means prohibited by 18 U.S.C. § 1589(a), in violation of 18 U.S.C. § 1589(b). Lilly received those benefits continuously throughout the period in which the venture obtained Nikai's labor, and each knowing receipt constituted a separate predicate act. In addition, Lilly personally oversaw Nikai's butchering labor during his teenage years and thereby knowingly obtained his labor by means prohibited by 18 U.S.C. § 1589(a)(2) and (4), repeatedly, each instance constituting a separate predicate act.

**D. Racketeering Activity**

200. The RICO Persons engaged in racketeering activity within the meaning of 18 U.S.C. § 1961(1), including obtaining forced labor in violation of 18 U.S.C. § 1589(a), knowingly benefiting from participation in a forced-labor venture in violation of 18 U.S.C. § 1589(b), and trafficking with respect to forced labor in violation of 18 U.S.C. § 1590, as applicable to each defendant's conduct alleged herein. For purposes of 18 U.S.C. § 1589(b), the GCCA Enterprise constitutes the "venture" referred to in this Complaint.

201. As alleged in the paragraphs above describing each RICO Person's role and predicate acts, each RICO Person either knowingly obtained Nikai's labor by means prohibited by 18 U.S.C. § 1589(a), or knowingly benefited, financially or by receiving anything of value, from participation in the venture that obtained his labor by those means, knowing or in reckless disregard of the fact that the venture was doing so, in violation of 18 U.S.C. § 1589(b). Delevin also harbored and obtained Nikai for labor in violation of 18 U.S.C. § 1590(a). The prohibited means included threats of serious harm, coercive family separation, isolation and confinement, engineered economic dependency, psychological domination, and abuse of legal process.

**E. Pattern of Racketeering Activity**

202. The predicate acts were related and continuous and constituted the Enterprise's regular way of conducting its affairs.

203. Related. The predicate acts were related. They had the same purpose, obtaining and retaining uncompensated labor for the GCCA Enterprise, and the same result, the Enterprise's retention of the economic value of that labor. They involved the same participants, the RICO Persons acting through the same Enterprise entities; the same victims, Nikai and other GCCA members; and the same methods of commission, the Systems of Coercion. Although the

particular work and the Enterprise entity benefiting from it changed over time, the method remained the same: GCCA Leadership assigned and controlled the labor, Nikai could not refuse it or negotiate its terms, the Systems of Coercion enforced his compliance, and the Enterprise kept the value of his work without compensating him.

204. Closed-Ended Continuity. The predicate acts demonstrate closed-ended continuity because the RICO Persons repeatedly obtained uncompensated labor through the Enterprise's Systems of Coercion for many years. With respect to Nikai alone, the Enterprise obtained and used his labor beginning when he was approximately seven or eight years old and continuing until his escape at age eighteen, deploying that labor successively in agricultural operations, construction and landscaping, commercial hemp production, and music and media operations. The same institutional mechanisms were used to obtain uncompensated labor from other GCCA members over the same period.

205. Open-Ended Continuity. The predicate acts also demonstrate open-ended continuity because obtaining uncompensated labor through the Enterprise's Systems of Coercion was the Enterprise's regular method of staffing and operating its activities, not a finite scheme directed toward a single occurrence. When Nikai escaped in or around September 2023, GCCA and its affiliated entities continued to operate, members continued to supply their labor, and the leadership hierarchy and institutional mechanisms through which that labor was obtained remained in place. Following Delevin's death in August 2025, the Enterprise continued under substantially the same leadership structure and, on information and belief, continues to employ the same systems of labor allocation and coercive control.

**F. Interstate Commerce**

206. The GCCA Enterprise and its affiliated entities engaged in commercial

transactions, financial transfers, and business activities that crossed state lines and utilized interstate banking and communication systems. More specifically, the GCCA Enterprise engaged in many interstate activities, including outside-client video work in Arizona and New Mexico, musical performances outside of Arizona, commercial musical recordings distributed through a streaming service, and a commercial hemp operation that sold its products outside Arizona.

**G. Proximate Cause and Injury to Business or Property**

207. The RICO Persons' violations of 18 U.S.C. §§ 1962(c) and 1962(d) injured Nikai in his property within the meaning of 18 U.S.C. § 1964(c). Through the racketeering activity alleged above, the RICO Persons obtained and retained years of Nikai's uncompensated labor for GCCA-affiliated for-profit and nonprofit operations that generated revenue, reduced labor costs, and sustained the Enterprise's financial structure. The economic value of that labor is property, and the RICO Persons deprived Nikai of it: the fair market value of his labor and the compensation it would have commanded.

208. Nikai's injury is direct, not derivative. Nikai personally performed the labor; Nikai personally lost the economic value of that labor; and the racketeering acts were the mechanism by which the RICO Persons extracted and retained that value.

**H. Timeliness of the RICO Claims**

209. Plaintiff's claims under 18 U.S.C. §§ 1962(c) and 1962(d) are subject to a four-year limitations period. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987). Those claims are timely on each of the independent grounds set forth below.

210. Separate Accrual. Each period of labor that the RICO Persons obtained from Nikai through forced labor was a new predicate act that inflicted a new and independent injury to his property: the loss of the value of that labor. A separate claim accrued with each such injury.

Nikai's compelled labor continued without interruption until his escape in or around September 2023. His claims for all labor the RICO Persons obtained within the four years preceding the filing of this Complaint are therefore timely, regardless of when any earlier predicate act occurred.

211. Equitable Tolling. In the alternative, the limitations period was tolled for as long as Defendants held Nikai, through September 2023. Throughout that period, extraordinary circumstances created by Defendants prevented him from pursuing any legal remedy. He was a minor until May 11, 2023, and for approximately thirteen years he was confined to a remote, fenced compound, which he left only under GCCA supervision for assigned work or chaperoned group outings, and he was without money, a driver's license, a bank account, or a telephone capable of reaching anyone outside GCCA. He had no unmonitored internet access, no access to legal counsel, and no unmonitored contact with anyone outside GCCA. He was subject to the Systems of Coercion described above, under which any assertion of independence brought discipline, isolation, and the threat of destitution and total separation from his community and family. Although Nikai thought the way GCCA made its members work was wrong, that understanding gave him no means of pursuing a remedy. Defendants also actively misled Nikai about the nature of his labor, presenting it as schooling, "mentorship," "internship," and participation in a creative mission, as alleged in Sections V and VI. Nikai pursued his rights diligently once those circumstances ended: he escaped at the first opportunity available to him and commenced this action within four years of leaving GCCA.

212. Equitable Estoppel. Defendants are equitably estopped from asserting a limitations defense. Their own coercive conduct, including the confinement, isolation, engineered dependency, and threats of serious harm alleged in this Complaint, is what prevented

Nikai from bringing these claims earlier.

213. Because the limitations period was tolled at least until Nikai's escape in or around September 2023, and because this action was commenced within four years of that date, all of Plaintiff's RICO claims are timely.

## TIMELINESS OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT CLAIMS

214. Plaintiff's claims under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1584, 1589, 1590, and 1595, are governed by the ten-year limitations period set forth in 18 U.S.C. § 1595(c). For a plaintiff who was a minor at the time of the offense, Section 1595(c)(2) provides that an action may be commenced not later than ten years after the plaintiff reaches eighteen years of age. Plaintiff's TVPRA claims are timely on each of the independent grounds set forth below.

215. Minority Tolling. Nikai was born on May 11, 2005, was brought into GCCA in or around 2010 at approximately four to five years old and remained a minor throughout the years in which Defendants obtained his childhood and adolescent labor. He did not reach the age of eighteen until May 11, 2023. Because Nikai was a minor when the offenses underlying his TVPRA claims occurred, the limitations period on those claims does not expire until May 11, 2033, under 18 U.S.C. § 1595(c)(2). This action was commenced well within that period, and Plaintiff's TVPRA claims arising from the labor Defendants obtained during his childhood and adolescence are therefore timely.

216. Continuing Conduct. Plaintiff's TVPRA claims are also timely under 18 U.S.C. § 1595(c)(1). Defendants' obtaining of Nikai's forced labor was a single, continuous course of conduct carried out through the same Systems of Coercion, and it did not end when Nikai turned

eighteen. It continued, without interruption and in the same form, for approximately five more months — until Nikai escaped in or around October 2023. Because the conduct underlying Plaintiff's claims was part of a single, continuing pattern of forced labor and trafficking, and because that conduct continued well within ten years before this action was filed, Plaintiff's TVPRA claims are timely in their entirety.

217. Timely Adult Claims. Independently, the labor Defendants obtained from Nikai after he reached the age of eighteen is timely by any measure. Between his eighteenth birthday on May 11, 2023, and his escape in or around October 2023, Nikai continued to perform the same uncompensated agricultural, construction, landscaping, hemp, and media and music labor, under the same Systems of Coercion, and was paid nothing. Those claims accrued no earlier than Nikai's escape in or around October 2023.

218. Equitable Tolling. To the extent any portion of Plaintiff's TVPRA claims would otherwise be untimely, the limitations period was equitably tolled until Nikai's escape in or around October 2023, because extraordinary circumstances created by Defendants stood in the way of any earlier filing and Nikai pursued his rights diligently.

219. Extraordinary circumstances created by Defendants prevented Nikai from pursuing any legal remedy while he remained within GCCA. Nikai was a minor until May 11, 2023. For approximately thirteen years he was confined to a remote, fenced compound in the high desert, which he left only under GCCA supervision for assigned work or chaperoned outings. He had no money, no driver's license, no Social Security card, no bank account, and no telephone capable of reaching anyone outside GCCA; he had no unmonitored internet access, no access to legal counsel, and no unmonitored contact with anyone outside GCCA. He was subject throughout to the Systems of Coercion described above, under which any assertion of

independence brought discipline, isolation, and the threat of destitution and total separation from the only community and family he had. Having been brought into GCCA as a young child and raised entirely within it, Nikai had no outside experience, relationships, or point of reference against which to measure his treatment or by which to seek help.

220. These Defendant-created conditions directly caused Nikai's inability to file suit earlier. A child confined to a fenced compound, without money, identification, transportation, a telephone, unmonitored contact with the outside world, or access to counsel, had no practical means to investigate or assert a legal claim. Defendants also actively misled Nikai about the nature of his labor, presenting it as schooling, "mentorship," "internship," and participation in a creative mission, which further prevented him from recognizing that he had been wronged and had a claim to pursue.

221. Nikai pursued his rights diligently once the impediment ended. He escaped at the first opportunity his age made possible: within approximately five months of turning eighteen, he retrieved his birth certificate, secretly circumvented GCCA's firewall to reach the outside world, secured outside help, and left by climbing the compound's perimeter fence at night in or around October 2023. After escaping with no finances and no resources, it took Nikai many years to become stable and re-build his life after the harm the Defendants caused. In addition, Nikai is still processing and recovering from the trauma due to the many years of forced labor, psychological control, and forced dependency he suffered at the hands of Defendants. The extraordinary circumstances that prevented suit ended with his escape, and Nikai commenced this action within the limitations period.

222. Equitable Estoppel. Defendants are equitably estopped from asserting a limitations defense. Their own coercive conduct — the confinement, isolation, engineered

economic dependency, misrepresentations concerning the nature of Nikai's labor, and threats of serious harm alleged throughout this Complaint — is what prevented Nikai from bringing these claims earlier.

## CAUSES OF ACTION

## COUNT I

**Forced Labor in Violation of 18 U.S.C. § 1589 (Civil Liability Under 18 U.S.C. § 1595(a))**
*(Against all Defendants)*

223. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs above.

224. Nikai is a victim of forced labor within the meaning of 18 U.S.C. §§ 1589 and 1595(a). Section 1589(a) prohibits knowingly obtaining the labor or services of a person by any one of, or any combination of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) the abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause the person to believe that, if he did not perform such labor, he or another person would suffer serious harm or physical restraint.

225. Each Defendant named in this Count knowingly obtained Nikai's labor, or knowingly participated in obtaining his labor, by one or more of those prohibited means, and did so intending the coercive effect of those means. Nikai performed the labor Defendants assigned to him because of those coercive conditions: he did not control whether he worked, what work he performed, the hours he kept, or the conditions of his labor, and he could not refuse an assignment without incurring the consequences Defendants had established. A refusal or resistance to a labor assignment was not treated as a legitimate exercise of autonomy but as a disciplinary infraction, the response to which was to assign still more labor.

226. Force, physical restraint, and threats of physical restraint, 18 U.S.C. § 1589(a)(1). Defendants confined Nikai from early childhood within a remote, fenced compound of approximately 227 acres in the high desert, far from any town and with no independent means of departure, such that Nikai ultimately had to escape by climbing the perimeter fence at night. A child who did not comply with an assignment could be “sent to the garden” for a full day of labor, could be stripped of his bed and belongings for as long as three months, or could be placed in a disciplinary “behavioral program” in which the child was given only a sleeping mat, a single pillow, and one set of clothes for a period lasting as long as three months. Defendants required Nikai to perform physically dangerous labor, including roofing, tarring roofs, operating chainsaws from ladders and rooftops, and hand-pollinating flowering hemp for shifts of up to twelve to fourteen hours in a mask not rated for the dust, and he was made to work even while sick.

227. Serious harm and threats of serious harm, 18 U.S.C. § 1589(a)(2) and (a)(4). Defendants obtained Nikai’s labor through serious harm and threats of serious harm, and through a scheme, plan, and pattern — the Systems of Coercion — intended to cause Nikai to believe that if he did not perform his assigned labor, he or others would suffer serious harm. The harm threatened included physical discipline and deprivation; demotion on the public “Members List,” with its attendant loss of privileges, increased surveillance, and additional labor; placement in disciplinary programs; the confrontational Personality Integration Rehabilitation Program Nikai witnessed used on others; severance of his few remaining family ties; and, upon any departure, destitution and shunning as a “defaulter.” Given Nikai’s circumstances as a child raised entirely within GCCA, with no money, no outside relationships, and no experience of life beyond the compound, that harm was sufficiently serious to compel a reasonable person of the same

background and in the same circumstances to perform and to continue performing the labor.

228. Each Defendant knew of the coercive circumstances compelling Nikai's compliance and knowingly obtained his labor by means of them, as set forth in the defendant-specific allegations above: Delevin directed the deployment of Nikai's labor and established and enforced the Systems of Coercion; Chase directed and maintained the labor and disciplinary practices and obtained his labor for Soulistic and GCCA; Tiyiendea DellErba set and managed Nikai's landscaping and construction assignments and determined when and where he worked; Lilly administered the engineered economic dependency that made departure impossible and directed his butchering labor; Amadon DellErba directed his commercial music and media labor and his labor at Camp Avalon and at Amadon's own residence; and each entity Defendant obtained and retained the benefit of the labor Nikai performed for it. The coercive means Defendants employed were a proximate cause of the labor they obtained, and the fact that Nikai eventually escaped does not negate that the means were successful in obtaining his labor for years.

229. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1589, and pursuant to 18 U.S.C. § 1595(a), Nikai suffered economic and non-economic harm, including the loss of the value of his labor, loss of earning capacity, severe emotional distress, and ongoing psychological injury, and is entitled to recover damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT II

**Trafficking with Respect to Forced Labor in Violation of 18 U.S.C. § 1590 (Civil Liability Under 18 U.S.C. § 1595(a))**

*(Against All Defendants)*

230. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs above.

231. Section 1590(a) prohibits knowingly recruiting, harboring, transporting, providing, or obtaining by any means any person for labor or services in violation of Chapter 77 of Title 18. A defendant who violates § 1589 by obtaining a victim's forced labor also violates § 1590.

232. Each Defendant knowingly recruited, harbored, provided, or obtained Nikai for labor or services, knowing and in reckless disregard of the fact that his labor would be and was obtained through force, fraud, and coercion. Defendants drew Nikai into their closed community in or around 2010, at approximately four to five years old, through his mother, and from early childhood directed him into GCCA's commercial and nonprofit labor operations.

233. Defendants harbored and maintained Nikai within the compound: within months of his arrival Defendants separated him from his mother and placed him in the basement of a communal house called "the Ark"; confined him to the remote, fenced compound; and denied him contact with the outside world through monitored devices and a firewall. Each entity Defendant harbored, maintained, and obtained Nikai's labor as an instrumentality of GCCA, and obtained and retained the benefit of that labor, as set forth in the defendant-specific allegations above.

234. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1590, and pursuant to 18 U.S.C. § 1595(a), Nikai suffered economic and non-economic harm, including the loss of the value of his labor, loss of earning capacity, severe emotional distress, and ongoing psychological injury, and is entitled to recover damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this

Court deems just and proper.

## COUNT III

**Involuntary Servitude in Violation of 18 U.S.C. § 1584 (Civil Liability Under 18 U.S.C. § 1595(a))**
*(Against all Defendants)*

235. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs above.

236. Involuntary servitude is prohibited by 18 U.S.C. § 1584, which makes it unlawful to knowingly and willfully hold a person to a condition of involuntary servitude. Defendants knowingly and willfully held Nikai in a condition of involuntary servitude from his early childhood until his escape in or around October 2023, compelling him to perform uncompensated labor through physical and legal coercion and without the practical freedom to stop or to leave.

237. Physical coercion. Defendants confined Nikai from early childhood within a remote, fenced compound of approximately 227 acres, geographically distant from any town, from which he had no independent means of departure and which he ultimately had to escape by climbing the perimeter fence at night and jumping down into the desert. Defendants also physically confined Nikai, both as a minor and as an adult, by appointing "watchers" and escort to keep tabs on Nikai's whereabouts within the compound, monitor his behavior, and ensure he was performing the compelled labor for Defendants. Defendants enforced his labor through physical discipline and deprivation, including the practice of "sending" a child "to the garden" for a full day of labor at any time and the "behavioral program" that stripped a child of his bed and belongings for as long as three months. During the time Nikai was a minor – the majority of the time spent at GCCA, he was vulnerable and was unable to leave the community on his own.

238. Legal coercion. Because Nikai was a minor throughout the years of his captivity, Defendants exercised and maintained legal and custodial control over him and used law and legal process to secure the conditions of his servitude, including the documents conditioning parental rights and custody on remaining within GCCA — which operated to keep Nikai's mother within GCCA, and Nikai with her — and the documents requiring the surrender of property and the assignment of his creative work.

239. Nikai's age and particular vulnerability are relevant to the degree of coercion sufficient to hold him in involuntary servitude. Nikai was brought into GCCA at approximately five years old and was raised entirely within it; he never developed an independent existence, outside relationships, or financial resources, and as a child he had no realistic ability to leave a fenced compound in the remote desert.

240. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1584, and pursuant to 18 U.S.C. § 1595(a), Nikai suffered economic and non-economic harm, including the loss of the value of his labor, loss of earning capacity, severe emotional distress, and ongoing psychological injury, and is entitled to recover damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT IV

**Beneficiary Liability Under 18 U.S.C. § 1595(a) for Violations of 18 U.S.C. §§ 1589, 1590, and 1584**

*(Against All Defendants)*

241. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs above.

242. Section 1595(a) permits a victim of forced labor, trafficking, and involuntary

servitude to recover from any person or entity that knowingly benefited, or received anything of value, from participation in a venture that the person knew or should have known was engaged in a violation of the TVPRA.

243. Defendants' operation of GCCA, its leadership, and its affiliated commercial and nonprofit entities constituted a venture — a group of two or more persons and entities associated in fact — through which Defendants together operated the compound and its enterprises, obtained the uncompensated labor of members including Nikai by the prohibited means described above, and channeled the resulting revenue and property value back to GCCA and its leadership. The venture was not a passive arrangement or an ordinary commercial exchange; each Defendant took part in it and provided active, ongoing support to it, and their sustained relationship reflects a common undertaking to obtain and profit from coerced labor.

244. Each Defendant knowingly benefited, financially and by receiving things of value, from participation in that venture, and knew, or in the exercise of reasonable care should have known, that the venture obtained labor through the prohibited means described above. As set forth in the defendant-specific allegations above, the individual Defendants benefited from the uncompensated agricultural, construction, roofing, landscaping, hemp, and music and media labor Nikai performed; from the use of the structures he built and the grounds and residences he maintained; from superior housing, household help, and access to vehicles, technology, and entity funds and credit cards not afforded ordinary members; and from the revenue the entities generated through his labor. Each entity Defendant knowingly benefited, through officers and managers who were simultaneously members of GCCA Leadership, from the labor Nikai performed for it and continues to occupy, use, or create revenue from that uncompensated work.

245. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1595(a),

Nikai suffered economic and non-economic harm, including the loss of the value of his labor, loss of earning capacity, severe emotional distress, and ongoing psychological injury, and is entitled to recover damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

**<u>COUNT V</u>**

**Vicarious Liability for Violations of 18 U.S.C. §§ 1595(a), 1589, 1590, and 1584**
*(Against GCCA, Avalon Universal Enterprises, Soulistic, Camp Avalon, Global Change Media, and Avalon Slow Food(s) Enterprises)*

246. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs above.

247. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

248. Under the TVPRA and federal common law, an entity is vicariously liable for the acts and omissions of its officers, directors, and agents committed within the scope of their authority, and each member of a joint venture is liable for the acts and omissions of the other members committed in furtherance of the venture.

249. Under the TVPRA and federal common law, an entity is also liable for the acts and omissions of its alter ego — a nominally separate entity or person that it dominates and uses as an instrumentality to accomplish a wrong.

250. Defendants Delevin, Chase, Tiyiendea DellErba, Catherine Lilly, and Amadon DellErba acted as the actual agents of Defendant GCCA when committing the wrongful acts and omissions alleged herein. Each held a leadership role within GCCA, exercised control over and managed the day-to-day operations of GCCA, and directed, supervised, or implemented the policies and practices through which GCCA obtained and retained Nikai's labor.

251. Each of these Defendants acted with GCCA's actual authority, and GCCA held each of them out to Nikai, to the other members, and to the outside world as authorized to act on its behalf — Delevin as founder and controlling authority who dictated GCCA's structure, doctrine, finances, and labor systems; Chase and Tiyiendea DellErba as his "seconds-in-command" who issued directives governing daily life and labor; Catherine Lilly as the elder who managed GCCA's financial and operational systems; and Amadon DellErba as the member of GCCA Leadership who headed Global Change Media, managed Camp Avalon and GCCA's Sedona-area properties, and served as Nikai's assigned counselor and designated "cosmic father." GCCA and the entity Defendants knowingly accepted and retained the benefits of their conduct — including the structures Nikai built and maintained, the grounds and facilities he serviced, the hemp his labor produced, and the recordings and performances his labor generated — and thereby ratified it.

252. Defendant GCCA is therefore vicariously liable for the TVPRA violations of Defendants Delevin, Chase, Tiyiendea DellErba, Catherine Lilly, and Amadon DellErba, each of whom held leadership roles in, exercised control over, managed the day-to-day operations of, and received or directed revenues from GCCA.

253. Defendant Avalon Universal Enterprises, Inc., d/b/a Earth Harmony Builders and d/b/a ARC Roofing, is vicariously liable for the TVPRA violations of its director and officers who were simultaneously members of GCCA Leadership — Defendant Catherine Lilly, Avalon's sole director; Defendant Tiyiendea DellErba, its vice president; and Defendant Chase, its president — who acted as Avalon's agents in obtaining and benefiting from Nikai's uncompensated construction and roofing labor.

254. Defendant Soulistic Medical Institute is vicariously liable for the TVPRA

violations of its officers who were simultaneously members of GCCA Leadership — Defendant Chase, its director, president, and secretary, and Defendant Catherine Lilly, its chief financial officer — who acted as Soulistic's agents in obtaining and benefiting from Nikai's uncompensated landscaping, grounds, and construction labor at its facilities and properties.

255. Defendant Camp Avalon is vicariously liable for the TVPRA violations of Defendant Amadon DellErba, a member of GCCA Leadership who managed Camp Avalon and acted as its agent in obtaining and benefiting from Nikai's uncompensated landscaping and construction labor.

256. Defendant Global Change Media is vicariously liable for the TVPRA violations of Defendant Amadon DellErba, a member of GCCA Leadership who, as its head and chief executive, acted as its agent in obtaining and benefiting from Nikai's uncompensated musical and media labor.

257. Defendant Avalon Slow Food(s) Enterprises, LLC is vicariously liable for the TVPRA violations of the members of GCCA Leadership who, acting as its agents, directed and obtained Nikai's uncompensated hemp labor for its Mystic Farms operation.

258. When Chase, Tiyiendea DellErba, Catherine Lilly, and Amadon DellErba assigned, directed, and profited from Nikai's labor, they did so simultaneously as GCCA Leadership and as the officers, directors, and managers of the entity Defendants. Their knowledge that Nikai's labor was uncompensated and coerced is therefore imputed to each entity Defendant, each of which knew, through these same officers and managers, that the labor from which it benefited was obtained through the coercive mechanisms alleged throughout this Complaint.

259. The entity Defendants did not operate as genuinely independent businesses.

GCCA dominated and controlled each and used each as an instrumentality to obtain and profit from Nikai's forced labor, such that they functioned as a single, integrated enterprise and as alter egos of GCCA and of one another. The following facts establish that unity of ownership and control.

260. GCCA owns the trade names under which its affiliates operate: Soulistic Hospice and Soulistic Healing Center are "registered to and owned by" GCCA, and Avalon's businesses, including Earth Harmony Builders and ARC Roofing, are wholly owned and operated through Avalon and GCCA. The same small circle of GCCA leaders comprises the directors and officers of the entities: Chase is GCCA's co-founder and Soulistic's sole director, president, and secretary; Catherine Lilly is Avalon's sole director and Soulistic's chief financial officer; Chase and Tiyiendea DellErba serve as Avalon's president and vice president; and Amadon DellErba heads Global Change Media and manages Camp Avalon and GCCA's Sedona-area properties. On information and belief, many of GCCA's affiliated businesses are registered under the Avalon name, and their profits funnel back to GCCA.

261. GCCA, Avalon, and Soulistic maintained shared bank accounts and issued credit cards connected to those shared accounts, which the Individual Defendants used for personal purchases. A single member of GCCA Leadership, Defendant Catherine Lilly, managed the finances and accounting of GCCA, Avalon, and Soulistic and controlled their lines of credit, property acquisitions, tax matters, and financial administration across the affiliated ventures. The proceeds of Nikai's labor generated through the entities were pooled and drawn upon by the leadership for personal residences, vehicles, and amenities without regard to which entity nominally earned them.

262. None of the entity Defendants was independently capitalized or independently

staffed. Each was staffed by members' uncompensated labor and controlled by the same leadership that governs GCCA itself, and each depended on the coerced, unpaid labor of members — including Nikai's — rather than on its own capital or paid workforce to build, remodel, maintain, and operate its facilities and to produce its goods, content, and services. GCCA in turn stripped incoming members of their assets, which were surrendered to GCCA rather than to any operating entity.

263. GCCA and the entity Defendants were operated interchangeably by a single leadership group that dictated major business decisions for all of them; the labor and assets of one entity were deployed for the benefit of another without accounting or compensation; and Delevin passed his decisions to Chase, Tiyiendea DellErba, Catherine Lilly, and Amadon DellErba to execute across whichever entity was involved. The entities observed no meaningful separation of management, finances, or operations.

264. Additionally, on information and belief, the entity Defendants participated in a joint venture with one another and with Defendants Delevin, Chase, Tiyiendea DellErba, Catherine Lilly, and Amadon DellErba to operate the compound and the affiliated businesses through which Nikai's labor was extracted.

265. That venture had all the attributes of a joint venture: a common agreement and purpose to operate the compound and its affiliated commercial and nonprofit enterprises through members' uncompensated labor; a community of interest in the labor, revenue, and property that labor produced; a joint right of control exercised by the shared GCCA Leadership over all of the entities and over Nikai's labor; and the sharing of the profits, revenue, and benefits generated from those businesses and from Nikai's forced labor. The venture's operations were highly integrated across GCCA and its affiliated businesses, and the participants exercised mutual

control over the labor-trafficking venture, including the trafficking and forced labor of Nikai.

266. As a direct and proximate result of the foregoing, and pursuant to 18 U.S.C. § 1595(a), Defendants GCCA, Avalon, Soulistic, Camp Avalon, Global Change Media, and Avalon Slow Food(s) Enterprises are vicariously liable for the TVPRA violations alleged in Counts I through IV and for all damages caused to Plaintiff thereby, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT VI

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**
*(Against the RICO Persons: the Estate of Delevin, Chase, Tiyiendea DellErba, Lilly, and Amadon DellErba)*

267. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs, and in particular the allegations set forth in the sections addressing the RICO Persons, the GCCA Enterprise, the RICO Persons' roles and predicate acts, racketeering activity, the pattern of racketeering activity, interstate commerce, and injury.

268. At all relevant times, the GCCA Enterprise was an enterprise engaged in, and the activities of which affected, interstate commerce, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each RICO Person is a "person" within the meaning of 18 U.S.C. § 1961(3) and is legally distinct from the GCCA Enterprise.

269. Each RICO Person was employed by or associated with the GCCA Enterprise and conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs — not merely his or her own affairs — by exercising direction over, managing, or carrying out the Enterprise's operations and its Systems of Coercion, as alleged above.

270. Each RICO Person conducted the affairs of the Enterprise through a pattern of

racketeering activity, as defined in 18 U.S.C. § 1961(1) and (5), consisting of repeated acts of obtaining forced labor in violation of 18 U.S.C. § 1589, knowingly benefiting from participation in a forced-labor venture in violation of 18 U.S.C. § 1589(b), and trafficking with respect to forced labor in violation of 18 U.S.C. § 1590, as alleged above. These predicate acts were related, and they were continuous, amounting to and threatening continued criminal activity, as alleged above.

271. The RICO Persons' violations of 18 U.S.C. § 1962(c) injured Nikai in his business or property within the meaning of 18 U.S.C. § 1964(c): the RICO Persons obtained and retained the economic value of years of Nikai's uncompensated labor — the fair market value of that labor and the compensation it would have commanded — and that concrete financial injury was directly and proximately caused by the racketeering activity, which was the very mechanism by which the RICO Persons extracted and retained that value.

272. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages he sustained, together with the costs of suit and reasonable attorneys' fees.

## COUNT VII

**Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)**
*(Against the RICO Persons: the Estate of Delevin, Chase, Tiyiendea DellErba, Lilly, and Amadon DellErba)*

273. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

274. Each RICO Person knowingly agreed and conspired with one or more of the other RICO Persons, in violation of 18 U.S.C. § 1962(d), to conduct and participate in the conduct of the GCCA Enterprise's affairs through a pattern of racketeering activity, and to facilitate the commission of that racketeering activity.

275. The existence of the agreement may be inferred from the RICO Persons'

coordinated conduct over more than two decades. They operated GCCA and its affiliated entities as a continuing unit for the common purpose of obtaining and retaining a centrally controlled, uncompensated labor force. They made and relayed operational decisions through GCCA Leadership meetings in which the use of members' uncompensated labor was directed. And each knowingly performed a defined role in the shared undertaking: Delevin directed the Enterprise and established and maintained the Systems of Coercion; Chase, Tiyiendea DellErba, Lilly, and Amadon DellErba implemented and enforced those systems and directed members' labor. From this coordinated, sustained conduct, it may be inferred that each RICO Person agreed that the pattern of racketeering activity would be committed.

276. As a direct and proximate result of the RICO Persons' conspiracy, Nikai was injured in his business or property as alleged above. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages he sustained, together with the costs of suit and reasonable attorneys' fees.

## PUNITIVE DAMAGES

277. Plaintiff realleges and incorporates by reference each of the foregoing paragraphs.

278. Plaintiff is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. *See Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

## JOINT AND SEVERAL LIABILITY

279. "Joint and several liability "applies when there has been a judgment against multiple defendants." If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the

full amount.

280. Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.

281. Plaintiff alleges each Defendant should be held joint and severally liable to Plaintiff for the totality of his injuries and damages alleged herein.

## **ATTORNEYS' FEES**

282. Plaintiff is entitled to recover his costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. *See* 18 U.S.C. § 1595(a).

283. All conditions precedent to Plaintiff's recovery of his costs and attorneys' fees have occurred or will occur prior to entry of judgment in this suit.

## **DEMAND FOR JURY TRIAL**

284. Nikai hereby demands a trial by jury as to all matters so triable.

## **PRAYER FOR RELIEF**

285. For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

a. All economic damages to which he is entitled;

b. All actual damages to which he is entitled;

c. All incidental and consequential damages to which he is entitled;

d. All mental anguish and emotional distress damages to which he is entitled;

e. All restitution damages to which he is entitled;

f. All unjust enrichment damages to which he is entitled;

g. All exemplary, treble, and/or punitive damages;

h. Attorneys' fees and costs of suit;

i. Pre-judgment and post-judgment interest at the highest rate allowed by law; and

j. All other relief to which he is or may be entitled in law or in equity.

**RESPECTFULLY SUBMITTED** this 3rd day of November 2026.

/s/ Samantha Drum
Samantha Drum (AZ 041439)
Kristina Aiad-Toss (OH 0101336)
*Pro Hac Vice Forthcoming*
Brian Colón (NM 14624)
*Pro Hac Vice Forthcoming*
Pilar Borneo (NM 153971)
*Pro Hac Vice Forthcoming*
Meagan Dove (CA 313117)
*Pro Hac Vice Forthcoming*
Katie Llamas (CA 303983)
*Pro Hac Vice Forthcoming*
**SINGLETON SCHREIBER**
6501 Americas Pkwy #670
Albuquerque, NM 87110
Tel. (505)515-4745
sdrum@singletonschreiber.com
ktoss@singletonschreiber.com
bcolon@singletonschreiber.com
pborneo@singletonschreiber.com
mdove@singletonschreiber.com
kllamas@singletonschreiber.com

Carol Merchasin (MA 55672)
*Pro Hac Vice Forthcoming*
**MERCHASIN LAW**

2300 Walnut Street #702
Philadelphia, PA 19103
Tel. (609) 666-8553
Carol@MerchasinLaw.com

*Attorneys for Plaintiff*